[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 416 
The complainant will be referred to herein as P. S. B. and the defendant as R. C. A. Occasion will arise in the course of this opinion to refer to certain other corporations. They are Philco Radio and Television Corporation, hereinafter referred to as P. R. T., and Transitone Automobile Corporation, hereinafter referred to as Transitone.
The issues drawn by the bill and answer and by the cross-bill and cross-answer, involve the same facts and present the same fundamental controversy. The evidence is undisputed. It is only with respect to the significance thereof in point of legal result that the parties are at variance. R. C. A. contends that the evidence shows defaults by P. S. B. which justify R. C. A. in proceeding with the steps necessary under the agreement to effect its termination. Accordingly its cross-bill prays the appropriate decree to that end. P. S. B. on the contrary insists that the evidence fails completely to show it in default in any respect, and accordingly prays that an appropriate decree be entered on its bill protecting it from the threatened action of cancellation which R. C. A., at the time the bill was filed, had taken the initial step to effectuate.
Both parties agree that, however the fundamental issue of default is decided, there must be an accounting between them in any event.
The first queestion I shall examine is the one of whether P. S. B. is guilty of having committed any default. This question, except as it relates to what is the royalty base, breaks itself into two main topics. These two topics are discussed infra under 1 and 3. The headings 2 and 4 infra which deal more directly with the royalty base are nevertheless related to the question of P. S. B.'s alleged defaults.
1. Did P. S. B. violate the prohibition of paragraph 8 of the supplemental license agreement of October 31, 1930? That paragraph is as follows:
"8. In the event that any apparatus licensed under said License Agreement as hereby modified shall be sold either (1) to a corporation, firm or association which, or individual who, shall own a controlling interest in your corporation by stock ownership or otherwise, or (2) to a *Page 418 
corporation, firm or association in which you or the stockholders of your corporation shall own a controlling interest by stock ownership or otherwise, the royalties to be paid under said License Agreement in respect of such apparatus shall be based upon the invoice price at which such purchaser resells such apparatus rather than upon your invoice price."
"You" and "your" in the paragraph refer to P. S. B. The supplemental license agreement in which the paragraph appears is in the form of a letter addressed by R. C. A. to P. S. B. and formally accepted by the latter.
There is no contention that any apparatus has been sold to any purchaser who has owned a controlling interest in P. S. B. Therefore the clause of the paragraph preceded by (1) may be ignored.
It is contended by R. C. A., however, that the clause preceded by (2) has been violated.
The following facts need to be stated in passing upon whether P. S. B. violated the requirements of clause (2) of the quoted paragraph. In 1932 P. S. B. organized P. R. T. with an authorized and issued capital of two hundred and fifty shares. P. S. B. owned all but three of the shares which were qualifying shares held by directors. It really owned the entire issue. So long, therefore, as that situation continued it is plain that the base on which P. S. B. was required to pay royalties was the invoice price at which P. R. T. resold the purchased apparatus. P. R. T. was organized as the sales subsidiary of P. S. B. for home radio sets. Transitone was organized as a subsidiary of P. S. B., but not wholly owned, to sell automobile radio sets. So long as that relationship continued, P. S. B. paid royalties on P. R. T.'s selling price, thus complying with the requirements of paragraph eight of the supplemental agreement. But in the case of Transitone, from January 1, 1932, to July 30, 1934, it paid royalties on the basis of its sales to Transitone, which were at cost, and not on the latter's sales to the trade. P. S. B. finally paid on the basis of Transitone's sales during those years, after demand by R. C. A., but under protest. The demand of R. C. A. in that particular appears to me to have been justly made in the light of paragraph eight of the supplemental license agreement, and the protest of P. S. B. which accompanied its retroactive payment does not appear to be well founded, for during that period P. S. B. owned a controlling interest in Transitone by stock ownership.
The P. R. T. to which reference is made throughout this opinion is the Delaware corporation. There were three other P. R. T.'s, one of New York, one of Illinois, and one of California. They may, however, be forgotten for the present purposes, because their situations possess no distinguishing features which justify special attention.
On July 30, 1934, what is referred to as the reorganization of P. S. B.'s business took place. It involved P. S. B., its four P. R. T. subsidiaries and its Transitone subsidiary. For convenience, all of the subsidiaries will at times be grouped for the purpose of discussion under the present head under the general designation of P. R. T.
As just stated, a reorganization took place on July 30, 1934. The details of this accomplishment need not be stated. It is sufficient to say that its net result was as follows. P. S. B. ceased to own a single share of P. R. T. or Transitone stock. It sold all of its holdings in its subsidiaries. The purchasers were certain key men in the P. S. B. organization. They were Gubb, general sales manager of P. R. T.; Heberling, executive vice-president of Transitone; Carpenter, who was in charge of tube sales; McDaniel, who was in charge of the order department; and Ramsdell, who was in charge of advertising and sales promotion. These men were as appears all identified with the marketing end of the P. S. B. business.
As stated they succeeded to all the stock interests which P. S. B., prior to July 30, 1934, had held in its subsidiaries. They paid therefor full and adequate consideration. They severed all the connection they theretofore had held with P. S. B. both as stockholders and employees. From that date P. S. B. and P. R. T. were completely separate. Neither held stock in the other. Neither had officers or employees in common, nor was there any semblance of identity between the stockholders of the two companies.
After the reorganization P. S. B. made sales to P. R. T. of apparatus which if manufactured under the license agreement. Indeed P. R. T. was P. S. B.'s exclusive purchaser of radio apparatus and it was P. R. T.'s exclusive seller. This was in accordance with the terms of the so-called *Page 419 
sales and assembly contract which the two corporations entered into contemporaneously with the carrying out of the reorganization program.
Before the reorganization of 1934, P. S. B. both manufactured and, through its P .R. T. sales subsidiary, sold to something like fourteen thousand distributors the radios which are familiarly known to the public as "Philcos." After the reorganization it continued its activities as a manufacturer, but confined its sales to P. R. T. as the sole purchaser, which in turn continued not as a P. S. B. subsidiary but as a wholly independent corporation, so far as stock ownership was concerned, to carry on the distributing business as theretofore. The same observations are applicable to Transitone.
When this change in corporate relations took place, P. S. B. then made returns to R. C. A. for royalty purposes of the selling price which it received from P. R. T. and Transitone, instead of the selling price which P. R. T. and Transitone received on their resales.
Now to this, R. C. A. objects. It contends that P. S. B. must continue as before July, 1934, to report P. R. T.'s and Transitone's sales as the royalty base, and it relies, though not entirely, on paragraph eight of the supplemental license agreement, above quoted, for support of its contention. The phrase in that paragraph which is important in the present connection is — "in which (corporation) you or the stockholders of your corporation own a controlling interest by stock ownership or otherwise."
Examining that phrase in light of the facts, it is perfectly plain that no controlling interest in either P. R. T. or Transitone is owned by either P. S. B. or any of its stockholders. But, says R. C. A., that a controlling interest within the meaning of the clause must be manifested exclusively by stock ownership alone, cannot be true; for, if that be true, no significance can be accorded to the words "or otherwise." The language is "by stock ownership or otherwise." That there is a control by P. S. B. over P. R. T. and Transitone otherwise than by stock ownership, is earnestly insisted by the solicitors for R. C. A. to be amply demonstrated by the evidence. That contention I shall not pause to examine under the present head of discussion. It will be the subject of examination at later stages of this opinion in connection with other contentions advanced by R. C. A.
[1] It is to be remembered that the language is the language of R. C. A. The letter in which it appears commences with the statement that "the undersigned (R. C. A.) proposes." Now it is elementary that when the language of a contract leaves its meaning in doubt, it is construed most strongly against him who uses it. 3 Williston on Contracts (1936) p. 1748, § 609.
[2] But there appears to me little if any doubt as to the meaning of the language immediately under examination. When it is observed that the paragraph embraces not only corporations that may be controlled by P. S. B. or its stockholders, but as well firms or associations, the phrase "or otherwise" finds logical antecedents in the sentence to which it appropriately attaches. How could there be the ownership of a controlling interest in a firm and in some forms of associations through stock ownership?
Furthermore the language is "shall own a controlling interest by stock ownership or otherwise." The italicized words clearly connote the idea of a power of control derived from a property right. It is a control that arises from an interest that is owned. This excludes the conception of control that is exerted through friendship, goodwill, apprehension of loss or duress.
I conclude then that there has been no breach of paragraph eight of the supplemental license agreement.
Whether the sort of control that R. C. A. contends P. S. B. is able to exercise over P. R. T. and Transitone is an element going to support other contentions of R. C. A., is another question. If control by P. S. B. of P. R. T. and Transitone exists, as is claimed by R. C. A., it is not such control as comes within the meaning of paragraph eight of the supplemental license agreement. That paragraph may, therefore, be dismissed from further mention.
2. But, it is contended, P. R. T. notwithstanding the complete change in the personnel of its stockholders, and the complete dissociation of its directors and officers from their former P. S. B. connections, is nevertheless under the control and domination of P. S. B., and in every true sense of the word is but an instrument, since the reorganization, which P. S. B. uses to defraud R. C. A. out of the royalties justly due *Page 420 
it. R. C. A.'s solicitors describe it first as the agent and then as the instrumentality or the alter ego of P. S. B. to carry on the marketing end of the latter's business, in order that a colorable set-up might be provided whereby P. S. B. might pay royalties on a base which is ascertained at the point where P. S. B. sells to P. R. T. rather than at the point where the latter sells to the trade. The latter, R. C. A. maintains, is under the facts the proper base. The difference in the two bases is exceedingly important from the viewpoint of both R. C. A. and P. S. B. It amounts roughly I believe to about two hundred and fifty thousand dollars a year which P. S. B. must pay to R. C. A. or not, according as the one base or the other prevails.
(Hereinafter special reference to Transitone will be omitted. Transitone is now, and ever since the reorganization has been, a subsidiary of P. R. T. and so may be ignored in the ensuing discussion.)
The evidence dealing with this question of whether P. R. T. since the reorganization of July 30, 1934, is a fraudulent device to enable P. S. B. to evade royalties, or whether it is the agent or instrumentality or alter ego of P. S. B., is quite voluminous and the briefs of argument upon it are extensive. If this opinion were to undertake to discuss in detail the evidence and examine the minutiae of the arguments upon its significance, it would run to a length even more intolerable than its length will eventually prove to be. I must content myself with a very general treatment of both.
This phase of the case over-laps considerably the question — what is the apparatus upon which P. S. B. is obligated to pay royalties? Is it a complete radio receiving set, or only certain components thereof? That question will be separately considered. See post, topic 4. R. C. A. contends that the licensed apparatus, licensed I mean in the sense of royalty-burdened apparatus, was a complete radio receiving set. Now R. C. A.'s contention in that regard is the major premise from which most of its argument upon agency, instrumentality and fraud proceeds.
Prior to the reorganization of July 30, 1934, when P. S. B. had its subsidiaries, its operations were broken into two divisions. One was manufacturing. That was carried on by P. S. B. itself. It made or purchased all the components of a complete radio receiving set whether for use in the home or in automobiles — receiver, loud speaker, battery eliminator, cabinet, etc. It assembled all the components into the complete receiving set. It boxed the set with a kit for installing it in the home or automobile, manual of instructions, etc.
This complete set, so prepared for shipment, was sold by it to P. R. T. (Transitone need not be specially mentioned, for the observations with respect to P. R. T. prior to when it became the controlling owner of Transitone on July 30, 1934, are in all essentials equally applicable to Transitone.)
P. S. B. entered into six contracts with its then subsidiary, P. R. T., all dated April 29, 1932. One covered the transfer by P. S. B. to P. R. T. of P. S. B.'s selling business. P. S. B. agreed to discontinue selling and to confine itself to manufacture. P. R. T. acquired marketing rights and the right to use in its business the trade-mark "Philco" which P. S. B. owned and which had an established reputation of great value in association with P. S. B.'s products. Another agreement covered battery sales by P. S. B. to P. R. T.; another, radio chassis sales; another, tube, cabinet and speaker sales; another, cabinet parts sales; and the sixth, the assembly work by P. S. B. for P. R. T. All these contracts were on a basis of compensation to P. S. B. of cost plus five per cent.
[3] P. S. B. organized P. R. T. in 1932. The reason why it did so and entered into the above referred to contracts with it, was because it conceived that by doing so it would be able to effect a considerable saving in the way of excise taxes to the Federal Government which at that time were being proposed to be laid by contemplated legislation. The legislation was enacted and P. S. B. paid the excise taxes according as it conceived them to be due under the new corporate set-up. Incidentally, it is in a controversy, yet unsettled, with the Government over the amount of excise taxes due from it.
The foregoing was the origin of P. R. T. It is said by R. C. A. that such being the purpose of its creation, it was conceived in fraud. Well, if so, it was not a fraud on R. C. A. I do not see, therefore, how R. C. A. can make anything of it. But is it a fraud for a company to so organize its business that its excise tax burdens shall rest on as favorable a basis as the law itself allows? I think not. *Page 421 
P. S. B. until the so-called reorganization of July 30, 1934, paid royalties to R. C. A. in accordance with its agreements, treating P. R. T. as a subsidiary within the meaning of paragraph eight of the agreement, quoted supra. R. C. A. does not contend to the contrary.
[4] We come now to the reorganization. When it took place the old contracts which P. R. T. had with P. S. B. were cancelled. P. R. T. entered into a new contract with P. S. B., known by the parties as the Sales and Assembly Agreement. This contract embodied all the features of the six old ones with such modifications, however, as comported with the new corporate relation which had been created, that is to say, with the relation of two wholly independent companies.
Under this contract P. S. B. was to manufacture the complete sets as theretofore at cost plus five per cent. It did so, delivering the complete set, packed for shipment to P. R. T. at a loading platform in P. S. B.'s factory, lacking only the stencilling necessary for shipment by P. R. T.
The object sought by P. S. B. to be accomplished by the reorganization was to secure a new and reduced base on which its royalties to R. C. A. would be calculated, viz., the selling price to P. R. T. (cost plus five per cent.) instead of the old base of P. R. T.'s selling price to the trade. There can be no doubt of that. It is frankly admitted. But what of it? P. S. B. had a right to sell at any price it saw fit. Its license from R. C. A. placed no limitations on the price which P. S. B. should exact for the apparatus. It was under no obligation to make prices that would yield the maximum of royalties to R. C. A. that the market would bear. It could if it saw fit fix prices that would result in a loss to it. R. C. A. has no right under the license agreement to demand that P. S. B. shall make all the profit it can possibly make. Therefore if P. S. B. chose to make a selling price that would yield to it only five per cent. of cost, it was well within its rights.
[5] The motive of reducing the royalty base which prompted the reorganization is therefore of no consequence. It is not to be supposed, however, that capable business men such as the P. S. B. executives are, would, merely out of a sort of spiteful desire to keep R. C. A. from getting the maximum of royalties, deliberately injure themselves by a senseless sacrifice of their own profits. That no such spiteful purpose inspired the reorganization and the sales and assembly contract, is shown by the evidence. The evidence shows that in the judgment of the P. S. B. executives competitive conditions had become such that something had to be done to bring down costs so that the Philco products could maintain their favorable position in the consumers' market. Royalties appeared to them to be the point at which a further saving could be made. Accordingly they concluded to sell at cost plus five per cent., thereby bringing down their royalty base. Rightly or wrongly they evidently concluded that any reduction in profits P. S. B. would suffer from abandoning sales by itself to distributors as theretofore, would be fully compensated by a five per cent. profit on a volume that they thought could be maintained, if not increased, by P. R. T. as the sole purchaser, notwithstanding the close competition, by reason of the royalty saving. The ultimate selling price could be put on a more favorable competitive basis.
R. C. A. characterizes rather severely this avowed purpose of the reorganization and its accompanying Sales and Assembly Agreement, as conceived in fraud. I do not think the characterization is justified. There is nothing in the license agreement which forbids what was done in this regard. There is no provision therein which the reorganization either evades or circumvents. It is a plain case of a patent licensee's fixing a selling price at a figure which he thought would yield to him the greatest advantage. The selling price being left to his absolute discretion, I am unable to see wherein it can be said to be a fraud on the licensor if the licensee fixes a price that he conceives to be most helpful to his own business.
R. C. A. points to certain results of the reorganization, catalogues them under convenient headings and after a minute examination of the evidence pertinent to each heading, insists that the conclusion is unescapable therefrom that the functions of P. S. B. and P. R. T. since the reorganization are so intermingled as to show that they are not two organizations but one. I shall now as briefly as possible refer to the various particulars which are thus catalogued and express my views thereon.
[6] Before doing so, however, it is pertinent to make a few relevant observations. *Page 422 
In the first place it cannot be denied that the two corporations have a very pronounced and vital interest in what I may call the common enterprise of promoting the sale to the public of Philco products. P. S. B. as manufacturer is desirous of seeing its product sold to consumers. Sales are the culmination of its business purposes. P. R. T. as a merchandizing organization is of course equally interested in the same end. The one as manufacturer and the other as merchandizer have mutual interests. Their activities as manufacturer and merchandizer are directed to a common end. Though a manufacturer of an article sticks strictly to his last of manufacture and a merchandizer of the article to his last of buying and selling, each conducting his own business in his own way without control or domination by one of the other, it nevertheless may be true, as it is in this instance, where one has agreed to manufacture exclusively for the other and the latter to buy his merchandise exclusively from the former, that the business fate of each hangs by the same thread. This does not make them one. While it has been held in many cases that courts will disregard corporate forms and the fictional personalities which the law ascribes thereto, in order to prevent the accomplishment of wrong, the perpetration of frauds or the evasion of statutory inhibitions, it has never been held that a corporation loses its legally distinct and separate personality by the mere act of its joining hands with another in a common enterprise. Express judicial authority to the contrary is to be found. Kendall v. Klapperthal Co., 202 Pa. 596, 607, 52 A. 92; S. G. V. Co. v. S. G. V. Co., 264 Pa. 265, 107 A. 721.
Something more than a community of interest in pursuit of a common end must be shown before a court of equity will, for the purposes of a given case, strip two corporations of their distinct personalities and practically blend them into one.
[7] With these preliminary observations, it is now in order to examine the particulars which R. C. A. emphasizes as supplying the something more that is necessary to show that P. R. T. is but P. S. B. wearing a mask. These will be stated under the same captions that are employed by the solicitors for R. C. A. in their brief.
(a) Functions of officials and general operations. Under this head it is pointed out that P. R. T.'s officials, the five individuals before referred to, perform the same functions for P. R. T. after the reorganization as they did before. That is quite true. The sale by P. S. B. of its stock in P. R. T. was to them. It was logical that they should be the persons who were offered the opportunity to buy it. They had conspicuously demonstrated their ability to market the Philco products. While they have continued to perform the same functions for P. R. T. as before the reorganization, they have been doing so as officials of a P. R. T. independently owned by them, whereas before the reorganization they did so as employees of P. S. B. Surely, there is no indication of identity between the two corporations arising from that fact.
The Sales and Assembly Contract of July 30, 1934, provided that P. S. B. should assemble for P. R. T. parts of radio receiving sets — the chassis and speaker whereof at least must have been purchased by P. R. T. from P. S. B., into complete radio receiving sets, in accordance with plans and specifications furnished by P. R. T. and should deliver f. o. b. the assembling plant of P. S. B. at Philadelphia, the complete receiving sets so assembled, the component parts thereof to be furnished by P. R. T. and to remain its property during such assembling. P. R. T. bought the components from P. S. B.
The P. S. B. factory was organized for production of radio sets on the mass scale. Its manufacturing operations were efficiently carried on down an assembly line with an extensive system of conveyor belts, each worker in a line having his own special function to perform in the continuously moving operation. The finished product came off the end of the line, ready for final testing and then packing for shipment.
The Sales and Assembly Contract placed on P. S. B. the duty of assembling the set. On August 27, 1934, that contract was modified so as to permit P. R. T. to do its own assembling. P. R. T. might have secured premises removed from the factory of P. S. B. to conduct its assembling work. It did not do so however. The operations continued exactly as they had been theretofore conducted, so far as physical appearances disclosed. But there were substantial changes beneath the surface. These were as follows. P. S. B. rented designated portions of its factory to P. R. T. These were the portions which P. R. T. used in its work of assembling the sets. There is no claim that the rent was unfairly apportioned. The office space had, after the *Page 423 
reorganization was effected, been apportioned between the two companies and the rent shared by them on a proportional base. This of course continued after August 27. Insurance charges were likewise proportionally borne. P. R. T.'s clerical force occupied the portion of the offices covered by its lease. All laborers who had been engaged in assembling for P. S. E. ceased to be employees of that company when P. R. T. took over its own assembling in August of 1934 and became employees of the latter. The portion of the factory in which they worked was placed under lease to P. R. T. P. S. B.'s employees had one entrance to the factory and P. R. T.'s another. Each set of employees as they went to work and departed from work recorded his hours by time clock or cards as the case might be. Each company had its own pay roll and paid the same from its own funds.
The only particular in which it can be said that the two companies appeared to be one was in the physical fact that their operations were housed in the same building and the manufacturing process was a continuous one. But this was only an appearance. The facts show the operations to have been independently conducted and the appearance of physical unity to have been in reality divisible.
As before stated P. R. T. could have removed all of its physical facilities to a detached location. The principal appearance of unity which now gives rise to suspicion would in that event have been absent. But to have done so would of course have involved greater expense in the way of handling and transportation. Taking over the portion of the factory and assembly line which P. R. T. needed for its assembling work, would manifestly result in a considerable saving of expense as against the expense which would be incurred had P. R. T. moved off to another location. The continuous and unbroken line of production as it moved along with the conveyors would be unbroken and the maximum of economy conserved, if P. R. T. were permitted to take over that portion of the line which its business of assembling required.
[8] Now while it must be admitted that the arrangement that was made in August of 1934 was such as was fairly calculated to arouse the suspicion of R. C. A. as to the bona fides of P. S. B. and P. R. T., yet when the facts are examined, I am of the opinion that the implications of their superficial appearance are entirely destroyed. If two independent companies are jointly interested in a common result, viz., as in this case, the purchase by the public of a product which one makes and the other sells, it does not follow that they are really one company simply because they resort to methods of economy of operation which cannot but result in a saving of expense to each in the particular field of its own individual activity. In Berkey v. Third Avenue Ry. Co.,244 N.Y. 84, 92, 155 N.E. 58, 60, 50 A.L.R. 599, Mr. Justice Cardozo, speaking for the Court of Appeals of New York, said: "Many arrangements for economy of expense and for convenience of administration may be made between carriers without subjecting them to liability as partners or as coadventurers, `either inter sese or as to third persons.'" He was speaking of carriers. But the principle is equally applicable to industrial corporations generally.
The factory arrangement made by these two companies appears to me to be one that was made solely in the interest of convenience and economy. As it contributes to a reduced cost for the finished product, it places that product in a more favorable competitive sales position in the consumers' market. By so doing the company which sells the product can maintain, if not increase, its consumption by the public, and the company which makes it is rendered more secure in the enjoyment of its present manufacturing volume with a reasonable prospect of increasing the same.
The assembly arrangement referred to does not show that the two companies were in reality one. Assuming them to be entirely independent companies, as they are, I can see no objection to its propriety.
(b) Salaries and compensation. Under this head, R. C. A. points out that after the reorganization the officers of P. S. B. continued to receive the same salaries as they received before, notwithstanding they no longer had any duties to perform with respect to P. R. T. I cannot see how this circumstance can possibly tend to show an identity of any kind between the two companies. Nor does the fact that P. R. T. was to pay for the articles purchased by it from P. S. B. that portion of P. S. B.'s administrative costs fairly attributable to that portion of P. S. B.'s production that is sold to P. R. T. tend to show such a thing; such payments were a part of P. S. B.'s selling price. (P. S. B. was engaged in manufacturing products other than those sold to P. R. T. Hence the apportionment of *Page 424 
administrative costs.) The question of the salaries to P. S. B.'s officers is of concern to P. S. B. only. P. R. T. can have no interest in it unless P. S. B. should deliberately pad its administrative pay roll. There is no charge of that kind. If P. S. B. did pad its administrative costs, however, P. C. A. would not be injured. It would be benefitted, because as P. S. B.'s administrative costs enter into the costs of manufacture, the royalty base would be increased by such padding to the advantage of R. C. A.
The earnings statements of P. S. B. and P. R. T. do not lend any countenance to the suggestion that the reorganization was a mere plan to short circuit the profits of P. R. T. into the treasury of P. S. B., or into the pockets of its officers.
The question of compensation to P. R. T.'s officers appears to me equally to be of no significance as showing an identity between the two companies. They were paid on a commission basis as before the reorganization. If P. S. B. makes bona fide sales to a corporation other than its controlled subsidiaries, it is of no concern to R. C. A. what compensation the purchaser pays to its officers. The articles when sold by P. S. B. were set free of all patent burdens and became ordinary commodities of commerce. This is so because while P. S. B.'s license to manufacture and sell was for restricted use, there is no contention that the sales actually made by it to P. R. T. were outside the restricted use. DeForest R. T. T. Co. v. R. C. A. (C.C.A.) 20 F. (2d) 598, 600; Curtiss Aeroplane Motor Corp. v. United Aircraft Engineering Corp. (C.C.A.) 266 F. 71, 77. So that what P. R. T. sold its purchased articles for and how much of the proceeds it paid to its officers is of no concern to anyone other than P. R. T. and its stockholders.
(c) Relations with distributors. After the reorganization, P. R. T. carried on its relations with its distributors exactly as it had done before. This was, I would think, as was to be expected. But, says R. C. A., P. R. T. did not inform its distributors of the fact that P. S. B. no longer owned it. This is admitted. The explanation is that the new owners of P. R. T. did not wish to disturb its distributors by advertising to them the fact that the company had been sold by P. S. B. I can see nothing in this circumstance that points to a oneness between the two corporations. All it indicates is an exercise of business prudence on the part of the new owners. There is no particular reason, certainly none required by law why a corporation should advise those with whom it has business relations of a change which has taken place in the personnel of its controlling stockholders. And there is none in morals, when as here the new owners are the same individuals who have always conducted the business relations which the corporation had theretofore had with its customers.
(d) Distributors' contracts. Under this head R. C. A. contends that the two corporations are indicated as one because the distributor contracts contain language which refers to the factory as P. R. T.'s. In reply P. R. T. points out that the form of contract in which such reference occurs was a form used in 1934 before the reorganization, when in practical effect the two companies bore the relation of parent and wholly owned subsidiary. After reorganization, however, the language containing that reference to the factory as P. R. T.'s was supplanted by language which referred to the factory as "manufacturing plants supplying it (P. R. T.)." Thus, the point is satisfactorily answered.
(e) Conferences and Monday morning meetings. After the reorganization, the officers of the two companies held stated conferences, an important one being the one held regularly every Monday morning. The purpose of these conferences was to correlate the operations of the two companies so as to bring them to a state of orderly harmony. One was manufacturing, the other was merchandising. It was as desirable for the former to avoid high manufacturing inventories as it was for the latter to avoid an accumulation of sets beyond the probable near demands of the trade. One of the topics for conference was the probable sales outlook for P. R. T. as reflected by the reports of its distributors. Information on this important subject would be of incalculable value to P. S. B. in the matter of placing its orders for material and of avoiding excessive inventories. The subject was one of mutual interest and such as any independent companies would confer upon and seriously discuss, when their relations were that of mutually exclusive manufacturer and distributor.
There were other subjects discussed at these conferences, such as general policy, advertising and new set designs. These *Page 425 
were all subjects in which the two companies had a common interest,
because they all bore a very material relation to the volume of sales which one might make and to the volume of manfacture which the other would be called upon to produce. They are far from indicating that the two corporations were in reality one. They are subjects about which the two companies as totally independent units, each with its own particular business to look after, would find it to their mutual advantage to hold under discussion at frequently recurring intervals, especially since the officers of both had had great familiarity theretofore with the problems that each subject presented.
(f) How P. R. T.'s selling prices are determined. Under this head the implication of R. C. A.'s argument is that P. S. B. fixed the prices at which P. R. T. should sell the purchased articles. That P. R. T. conferred with Skinner, P. S. B.'s president, on the subject of P. R. T.'s selling price is admitted, and that Skinner knew what those prices would be in advance of their public announcement to the distributors, is also admitted. I shall not review the details of the evidence bearing on this subject. It was a subject in which P. S. B. was manifestly interested. Skinner's advice in connection with it was undoubtedly of great value in view of his past experience. The evidence shows however that the determination of P. R. T.'s selling prices was in the control of its appropriate officials. But even if a manufacturer retains control over the retail price of his product, it cannot be said that he and his distributor are thereby blended into one. Modern fair trade acts countenance such arrangements. The effect of such acts certainly cannot be to obliterate the independent personality of either the manufacturer or his distributor or retailer.
It is said that if P. R. T. refused to take Skinner's recommendations in the matter of its selling prices, P. S. B. could force P. R. T. into compliance by refusing to approve the designs for apparatus for which P. R. T. placed weekly orders and thereby force the latter to adopt a price list of Skinner's dictation. To this it is enough to say that there is no evidence of any such compulsion on P. S. B.'s part and, further, that P. S. B. could practice it only by breach of its contract obligations.
(g) Advertising. The Sales and Assembly Contract provides that P. R. T.'s advertising policies and copy shall be approved by P. S. B. Does that indicate a oneness between the corporations? I think it is far from doing so. It is to be remembered that P. R. T. was to market products under P. S. B.'s trade-mark "Philco." That mark was of great value and enjoyed a high reputation. For P. S. B. to have the right to approve advertising policies and copy which related to goods bearing that mark, speaks not of unity between it and its exclusive customer, but rather of a wise and prudential regard for protection of the trade-name which, at a not distant day, was to return to P. S .B.'s exclusive control.
[9] It is also said that P. R. T. described itself as the world's largest radio manufacturer with P. S. B.'s consent. Now it may be a question for argument whether that designation was improper, the argument turning on whether "radio" has the large meaning of a complete receiving set. If the controversy here were one between a stranger and P. S. B., such advertising by P. R. T. with P. S. B.'s consent might be laid hold of to show the existence of an agency from P. S. B. to P. R. T. Bell v. Viavi Corp., 4 W.W. Harr. 76, 143 A. 255; Bell v. Viavi Corp., 4 W.W.Harr. 176, 146 A. 605. But that would be on the principle of estoppel. Now estoppel is a doctrine which on occasions suppresses the truth. Operating as it does at times at variance with the truth, courts should never apply it and they never as a matter of fact do apply it, unless to withhold its application would work a fraud upon him who had been misled by the false representations on which the estoppel is based, to alter his position for the worse. R. C. A. was not deceived by the advertisements. It took no position nor did it do any act in reliance upon the advertisements. I do not regard the advertisements of any important significance. There are other thoughts which might be mentioned as showing the insufficiency of the advertisements to rebut the truth of what the overwhelming weight of the evidence otherwise establishes, viz., that these two companies are not one, but in fact as well as strict legal concept are two. I shall not burden this opinion which bids fair to grow to tedious length with expressing and elaborating those other thoughts. *Page 426 
(h) Use of common name. What has just been said under advertising, is applicable under this head.
(i) Patent markings and labels on sets. The license from R. C. A. to P. S. B. requires the licensee to affix to all apparatus manufactured and sold under the license, a plate reading "Licensed only for Radio Amateur, Experimental and Broadcast Reception," and giving the dates of the patents which in the opinion of R. C. A. are used in such apparatus. This provision does not require P. S. B. or any other particular person to subscribe to the markings and labels. No one need sign them. P. R. T. which put out the sets placed its name under some of the markings and labels. That was a work of supererogation. No name need have appeared. I can attach no significance to what occurred in that regard. It did not indicate P. R. T. to be a licensee.
(j) Miscellaneous items. Under this head several things are mentioned as showing the two companies to be one. These are that since the reorganization or separation of the two companies, they have employed the same lawyer, an audit is made for both at the same time by the same auditors, employer's liability insurance, fidelity bonds are written covering employees of both companies (but running to both companies as their interests might appear), fire insurance is written the same way, and that Skinner transferred P. R. T.'s membership in the Radio Manufacturers' Association as though he were still the executive head of P. R. T. I cannot possibly see how these things are of importance as indicating that the two companies are one. They are relatively trifling matters which, if the larger features tending to show unity of corporate identities were closely balanced, might serve to tip the scales of doubt.
(k) Export sales. I shall not take the time to explain the point made in this connection. It appears to lack any important significance.
(l) Design and engineering. Under the Sales and Assembly Agreement, P. R. T. is to furnish designs, plans, specifications and drawings for the sets it desires and P. S. B. is to manufacture in accordance therewith. But P. S. B. reserves the right to approve the designs, etc., in whole or in part and as to kinds, class and quality of materials and parts; and P. R. T. is forbidden to make any change in designs, etc., after the same have been approved by P. S. B. In the paragraph of the agreement following immediately after the foregoing, language is used which shows the rationale of those provisions as well as of the provision that after the manufactured product is delivered by P. S. B. to P. R. T., the latter is forbidden to make any modification, addition or change of any kind in the character, quality, material, parts, design, construction or appearance of the goods purchased. The language I refer to is as follows: "For the further and better protection of the good will and trade name and trademark of the Seller (P. S. B.) and the maintenance of the character, quality and standard of the products manufactured by it and sold under its trademark and trade name to the public, the Buyer (P. R. T.) covenants, etc."
Manifestly P. S. B.'s veto control over designs, etc., is in the interest of the protection of its highly valuable trademark "Philco." Its purpose in that regard is easily understandable and is in no sense referable to the idea that P. S. B. and P. R. T. are one.
P. R. T. maintains an engineering department. It did so before its separation from P. S. B. Its annual cost is about five hundred thousand dollars. P. S. B. also maintains an engineering department which is confined to factory engineering problems. The approach of P. R. T's engineering and research department to its problems is from the sales angle. Its studies are directed to designs, devices, plans and policies that are calculated to promote and stimulate sales. If a merchandizer of an article that contains patented features sees fit to spend money in studying in what designs the article may be attractively dressed and what gadgets may be added to it so as to make the greatest popular appeal to public demand, and then calls on the licensed manufacturer of the article to produce it for him, I do not think it can be said that the merchandizer's expense in that regard is a part of the manufacturer's own factory engineering expense or a part of his cost of production.
The remarks in the preceding paragraph have their application to the accounting phase of the case.
(m) Assembly work. Under this head, R. C. A. dwells upon how the work of assembling complete radio sets "has been bandied back and forth * * * as a *Page 427 
shuttlecock" between P. S. B. and P. R. T. It points out that the work of assembling has been done first by one company and then by the other according as the situation of the moment would suggest as the most advantageous for royalty saving purposes. The last so-called bandying back of the assembly work after P. R. T. took it over, it should be stated, was because of the fear which R. C. A. aroused in the management of both P. S. B. and P. R. T. by its threat of cancelling the license agreement and thereby practically destroying both companies so far as the business of manufacturing and selling radio sets is concerned. Since before the reorganization down to since April 29, 1935, R. C. A. points out there have been five different methods of handling the assembly work as between the two companies.
R. C. A.'s discussion of this so-called bandying about of the assembly work has a twofold aspect. The first is that it is said to reveal another indication of that which the general catalogue of circumstances with which it is listed is charged as showing, viz., that the two companies are but one. That the two companies have a community of interest in seeing to it that the finished product bears as light a royalty burden as possible, is not denied. So long, however, as what they do is not in violation by P. S. B. of its license agreement, R. C. A. cannot object. P. S. B. is not required to so operate under the agreement as to make the highest royalties for R. C. A. It is of course bound to keep within the contract. So long as it does that, it is at liberty to select between possible ways of obedience, that one, if there is one, which is the least expensive to it from a royalty point of view. That is what it did in the matter of assembly work. Since P. R. T. which was to sell the product was vitally interested in the cost to it of the product, the reason is apparent why it was willing to cooperate with P. S. B. in handling the assembly problem in a way that would result in the greatest economy in royalties. The shifting of assembly work from one company to the other is explicable on that purely practical business consideration. It is not referable to any identity of corporate personalities.
[10] The second aspect of R. C. A.'s discussion of the manner in which assembly work has been handled, has to do with whether or not the cost of assembly, by whichever company it is done, is to be computed as a part of the royalty base. Now that problem is but a corollary to the larger and more fundamental one of what is the article upon the selling price of which the royalties are due. R. C. A. contends that royalties are calculable on the selling price of a complete radio receiving set, the thing that is installed in the home or in automobiles ready for immediate operation. P. S. B. contends that royalties are computable on the selling price of something less than a complete radio receiving set. The difference between the parties in this particular will be the subject of specific discussion at a later point in this opinion, when the license agreement is examined. It is in the field of this difference between the parties as to what articles enter into the royalty base, that the controversy over assembly work falls. Of course the cost of any assembly work that is necessary for P. S. B. to do in order to produce apparatus that is in the agreement's royalty base, must be counted as a part of its selling price to P. R. T., that price being cost plus five per cent. That is so, even if P. R. T. does the work, because it would be neither right nor just for P. S. B. to detour a cost which is legitimately its own, past its own pay roll to the pay roll of its purchaser. Any assembly work that is attributable to apparatus, the selling price of which constitutes no part of the royalty base, if it is done by P. R. T., is not chargeable to P. S. B.'s cost.
By that I mean that if P. R. T. purchases we will say chassis, loud speaker and cabinet and does the work of installing the chassis and speaker in the cabinet, I find nothing in the contract which requires P. S. B. to pay a royalty on P. R. T.'s cost of installation. This question of assembly work and how it is allocable from a royalty point of view, comes back to the question, later to be discussed — What is the apparatus that the license agreement specifies, the selling price of which supplies the royalty base?
The foregoing discussion of "assembly work," in connection with the royalty problem, has, I conceive, nothing to do with whether the manner in which assembly work has been conducted, shows a oneness between the two companies, which is the special thesis in support of which R. C. A. has dwelt upon it under the present head of discussion. As R. C. A. has discussed the royalty phase of assembly work in the *Page 428 
present connection, I deemed it appropriate likewise to do so. The facts and their claimed implications, briefly discussed under the foregoing lettered paragraphs, do not support the contention of R. C. A. that P. S. B. and P. R. T. should be treated as though they are only one corporation. R. C. A. seeks to have them so treated because, it contends, P. S. B. exercises a power of controlling dominance over P. R. T. and has used that power to defeat R. C. A. in the full enjoyment of its rights under the license agreement. The principal question, therefore, in the present connection is whether P. R. T. is under the domination and control of P. S. B. The discussion in the above-lettered paragraphs has covered most of the facts and arguments by which R. C. A. seeks to sustain its side of that question.
There are other facts and deductions therefrom which R. C. A. insists support its contention that P. R. T. is controlled by P. S. B. I shall turn now to a brief mention of those other facts and contentions.
[11] Before doing so, however, it is in order to say that I have no doubt that the officers of P. S. B. have a great deal of influence with the responsible officials of P. R. T. This influence, however, appears to arise solely from the respect and confidence which the P. R. T. officials have in the business wisdom and experience in the radio field which the officials of P. S. B., especially Skinner, had demonstrated in a conspicuously successful way. Respect and confidence were mutual, for the P. R. T. officials had demonstrated in the marketing branch of the business an ability that deservedly won the confidence of Skinner. Since the separation of P. R. T. from P. S. B., however there was no dominance and control by P. S. B. through Skinner or anyone else, over the five men who had left P. S. B. and had become the controlling owners of P. R. T. As officials of P. R. T. they were its free and independent masters. Theirs was the right to determine its policies. Their liberty of action was unrestrained in all respects except in so far as power of approval was reserved by P. S. B. of such things as might injuriously affect the reputation of the highly valuable trade name and mark of "Philco" which P. S. B. had spent several millions of dollars in dignifying before the public. Reservations of approval designed for that purpose are far from unusual. They are perfectly proper and legally legitimate. They do not spell a control and dominance that would warrant a court, by reason thereof, to declare that the corporation which had submitted to it was a sham creature subject to the orders of the other, in fact its alter ego. There is little warrant for such a declaration in the fact that the officers of the alleged puppet corporation conferred with the officials of the other, entertained respect for or in fact solicited their valued advice and elected to follow it. It is a misnomer in law to designate as control and dominance the force which ideas possess that command acceptance solely because of their inherent persuasiveness or because of the particular persuasiveness they derive from the prestige of their sponsors. Whatever control P. S. B. exercised over P. R. T., except in the negative respect of withholding approval to the legitimate extent just referred to, is of that character.
[12] I now mention the other facts which are said to show a practical though not theoretical dominance by P. S. B. over P. R. T. The first alleged other fact of this character is asserted to be the fact that P. S. B. originated the idea of selling its stock interests in P. R. T. to the group constituting its principal sales personnel, and that the purchasing group was coerced, not by words but by the dependency of their situations, to do as P. S. B. dictated, not only in the matter of buying the stock but as well as in the matter of the sales and assembly contract. — I shall not dwell upon the details of the evidence by which this proposition is sought to be sustained. I do not think the evidence sustains it. The proposition was an exceedingly attractive one to the proposed purchasers. They were to take over P. R. T. under practically the same conditions as it had theretofore been operated in association with P. S. B. That is true, with this important exception, viz., that now the purchasers and not P. S. B. were to own and operate P. R. T. as an independent concern. Experience showed that it could make money and the purchasers had a right to believe that with complete independence in management and policies, P. R. T. could be made to surpass the accomplishments of its past. P. R. T.'s earnings for the first full year of its operation under the guidance of its purchasers revealed the great attractiveness of the bargain they had made. It is easily understandable why no coercion, spoken or silent, *Page 429 
was necessary to induce the purchasers to embrace the offer which was made to them.
Another fact laid hold of by R. C. A. as calculated to show that P. S. B. is in a position of control and dominance over P. R. T. is the situation that arises out of the so-called pooling and repurchase agreements that relate to the stock of P. R. T. To recite those agreements and to discuss the details of argument in relation thereto, out of which a measure of control by P. S. B. over P. R. T. is sought to be spun, would take too much of time and space. It is sufficient to say that I cannot accept the conclusions which the solicitors for R. C. A. deduce from those agreements.
[13] Neither am I impressed by the argument that P. S. B. can force its will upon P. R. T. by threatening to take certain positions with respect to P. S. B.'s rights under the Sales and Assembly Contract, unless P. R. T. will submit to its dictation. P. S. B. has never, so far as appears, either assumed or threatened to assume those intimidating positions. Furthermore, if it did so with the purpose of asserting a control which it has no legal right to exercise, it would act in clear violation of P. R. T.'s contract rights. It is a paradox, legally but not morally true, that a party to a contract has a right to break it. If he exercises this pseudo right — this option, it might better be called — he does not destroy the contract. It continues to bind him. The law will require him to pay for his high-handed conduct or in proper case enjoin him from a continuance of his faithless behavior. No authority anywhere can be found for the doctrine, however, that one party to a contract can be said to control the other, as P. S. B. is said to control P. R. T., simply because of the damage he may do the other by the unlawful breach, actual or threatened, of the obligations that bind him.
On pages 150, 151, and 152 of R. C. A's brief there are six particulars in which it is said that the disguise of P. S. B. since the reorganization in the costume of P. R. T. is obviously revealed; and at pages 161, 162, and 163 of that brief it is further said that the existence of a sales agency relationship between P. S. B. and Transitone with the former as principal and the latter as agent, is in fifteen particulars disclosed. The particulars in both instances are stated in the form of conclusions of fact drawn from the evidence. I believe I have touched at one place or another upon all the leading facts which R. C. A. relies upon to support those conclusions, not with that degree of ramifying detail with which the R. C. A. brief discusses the facts, but sufficiently, I think, for the purposes of this opinion. There are a few fact aspects in this connection, however, which I have not commented upon in what has heretofore been said. But those are minor aspects which do not appear to me to be of sufficient significance to warrant special attention in connection with the question of whether P. S. B. dominates and controls P. R. T. and Transitone. These are aspects, for instance, that relate to the agreement to purchase exclusively from and not to compete with P. S. B. during the life of the sales agreement, the obligation of P. R. T. to move to another factory site if P. S. B. moves, the appearances of the two companies at certain N. R. A. hearings apparently as one, the visit of Ramsdell of P. R. T. to the R. C. A. laboratories, the so-called standard cost basis of manufacture, subject to year end adjustment, by which P. S. B.'s selling prices to P. R. T. and Transitone are ascertained, the inspection by P. S. B. of the auditor's reports of P. R. T. and Transitone, and the agreement of P. R. T. to pursue in a general way, after the separation, the sales policies which it had pursued theretofore when it was under the admitted control of P. S. B.
[14-18] From these facts, R. C. A. contends first that P. R. T. and Transitone are in law nothing more than the selling agents of P. S. B. and that the sales to them are in reality no sales at all. That one corporation may act as the agent of another is of course true. Authority need not be cited for that proposition. When an agency exists, using the word in its proper legal sense, the acts of the agent are the acts of the principal. If property be the subject of the agency, the title is in the principal. If profits be earned, they belong to the principal and if wrongs be done by the agent the liability therefor rests on the principal though, of course, the agent may also be liable. The agent is but the arm of the principal. Now in this case, there is no claim that the business which P. R. T. conducts is the business of the P. S. B. There is no claim that in strict legal right P. R. T. is not the owner of the goods which it buys from P. S. B. Neither is there any claim that when P. R. T. sells to a distributor, the account either belongs to or may *Page 430 
even be collected by P. S. B. The proceeds of all sales by P. R. T. belong exclusively to it. Any losses it suffers, it alone bears. Any profits it makes it keeps. They are not conducted through dividends or otherwise to P. S. B. The same observations apply to Transitone.
It cannot be said that the business of purchasing and selling which P. R. T. and Transitone conduct is the business of P. S. B. The facts lend no countenance whatever to that suggestion. If agency exists, it is not an agency to transact any part of the alleged principal's business. What, I think, the solicitors for R. C. A. mean in their contention as to agency is really this — that P. S. B. has set up an agency in the sense of an instrumentality, not in the strict legal sense of an agency, to enable it to escape its obligations to R. C. A. under the license agreement. I have before adverted to the legally permissible privilege that P. S. B. has to do anything it pleases to place its royalty obligations on a basis as favorable to the prosperity of its business as possible. So long as it keeps within the obligations of its contract, there is no room to charge it with an evasion of royalties, even though royalties to R. C. A. are in fact reduced by what P. S. B. does.
As I understand R. C. A.'s argument, it is not the legal concept of agency, as properly understood, which it relies upon as showing a control by P. S. B. over P. R. T. It is rather upon the doctrine of instrumentality that R. C. A. relies to sustain its charge that P. R. T., since its separation from P. S. B., is but a piece of mechanism which the latter uses to escape its just royalty obligations.
[19] Whether P. R. T. is the instrument of P. S. B. within the meaning of the instrumentality doctrine, depends in the first place upon the degree of control, if any, which P. S. B. exercises over P. R. T. Control to a degree that shows the presence of what is tantamount to compulsion, either actual or potential, is the first essential for the arising of the instrumentality rule. That control may, I suppose, be assured by contract arrangements specifically directed to its creation. But of that sort of control, there is no evidence in this case. The most familiar form in which control in the sense of the instrumentality rule is found to exist, is in the form that exists when one corporation, commonly called the parent, is able by reason of stock ownership to dominate the management and policies of another corporation, commonly called the subsidiary.
Even in the case of a subsidiary, however, it does not always follow that courts will disregard the separate legal entity and distinct legal personalities which the parent and its subsidiaries have in contemplation of law, and say that the subsidiary is but the parent by another name. We find this exemplified in Berkey v. Third Avenue Ry. Co., 244 N.Y. 84, 155 N.E. 58, 50 A.L. R. 599. See, also, Powell, Parent and Subsidiary Corporations, § 22, pp. 90-94. In Owl Fumigating Corp. v. California Cyanide Co., Inc. (D.C.) 24 F.(2d) 718, cases are cited which show the general rule of law to be settled that neither ownership of the capital stock of one corporation by another, nor identity of officers, nor loans of money by one to the other, will of themselves, notwithstanding the close relationship between them and the potential compulsion which one may possess over the other, lead the law to conclude that the property of one is the property of the other, or that one is the agent of the other, or its alter ego, or its department or that the one is used by the other as a blind or instrumentality to perpetrate fraud, justify wrong, defend crime or defeat public convenience.
It is the exercise in fact of the potential power of control which the parent has over the subsidiary and the practical operation of its consequences, which supply the test for determining whether the instrumentality rule will be applied so as to make the parent responsible for the acts of the subsidiary.
All the cases (except cases that show strict legal agency as exemplified for instance by Steele v. C. G. Meaker Co., Inc.,131 Misc. 675, 227 N.Y.S. 644, affirmed 226 App.Div. 717, 233 N.Y.S. 901) cited by R. C. A. to sustain the application of the instrumentality rule are distinguished in two important features, neither of which is found present in this one. The first is that in all those cases the relation between the two corporations was plainly that of parent and subsidiary, as that phrase is commonly understood. In respect of the usual indicia which indicate that relationship, none is to be found in the case sub judice. Here there is no ownership whatever of P. R. T. stock by P. S. B., not to speak of a controlling ownership; there is no identity of either stockholders or directors or officers. The second distinguishing feature between *Page 431 
this case and those cited by R. C. A. to sustain the application of the instrumentality rule consists of this — in those cases if control was actually exercised by the parent, the beneficial results of the subsidiary's activity were siphoned or capable of being siphoned over to the parent as the complete or substantial owner or to its stockholders, such results being either in the form of profits if earned, or liabilities escaped or inhibitions either statutory or injunctive, avoided. Here the benefits of P. R. T.'s activities do not inure to the advantage of P. S. B. in any way that is comparable in principle to the advantage of the parents in R. C. A.'s cited cases. The manner in which P. S. B. is advantaged by the separate existence and functioning of P. R. T. under the Sales and Assembly Contract, and the unobjectionable character of that advantage, have heretofore been pointed out. The significant thing about it in the immediate connection is, that the so-called advantage is not one that first accrued to P. R. T. in its own right and through it was capable of being passed on to P. S. B. by virtue of the latter's controlling power.
Economy of time and space suggests that I refrain from reviewing the cases cited by R. C. A. in support of the applicability of the instrumentality doctrine to this case, for the purpose of showing how each is distinguishable in the important features just referred to.
[20] My conclusion under this second head of discussion which started at a distant point in the early part of this opinion, is that P. R. T. is neither an agent, instrumentality, alter ego, or sales department of P. S. B. subject to its control and domination. Therefore the royalty is not computable on the selling price which P. R. T. receives from its distributors. It is to be computed on P. S. B.'s selling price to P. R. T.
[21, 22] 3. R. C. A. contends that the facts stated under the foregoing head disclose that the benefits of the license agreement have been divided or shared by P. S. B. with P. R. T. The agreement expressly forbids that its benefits be divided or shared except with the written consent of the licensor. It also provides that in the event of a failure of the licensee to comply with the obligations of the agreement, the licensor may declare the same to be cancelled, after giving the licensee the required notice of its alleged default and an opportunity to correct the same, and after a refusal by the licensee during the period of grace to amend its breaching conduct.
There are two things spoken of in the clause containing the prohibition. They are (a) dividing, and (b) sharing the benefits.
(a) Was there a dividing of the benefits? I cannot conceive of what this word means in its present connection, unless it be that the licensee shall not divide his right under the license into parts and transfer one or more of the fractional parts to another. Some such thing occurred in the case of Brooks v. Byam et al., Fed.Cas. No. 1,948, 2 Story, 525. There the owner of a patent for the making of friction matches sold to one Brown six rights therein, that is to say, the right to employ six persons at the same time in the manufacture of matches under the patent. Brown sold to Brooks one of the rights, that is to say, a right to Brooks to employ one person and one only in the manufacture of matches under the license. It was held that Brown had divided his license.
Nothing comparable to that has been done by P. S. B. It has conveyed nothing whatever to P. R. T. in the way of a right to operate under P. S. B.'s license from R. C. A. What it has done, amounts to no more than this — it has sold to P. R. T. apparatus covered by a patent. It had a right to do that. When the sale was completed, the apparatus as a commodity of commerce was set completely free from the patent monopoly except in so far as restrictions as to use were concerned, as to which restrictions there are no controversies. A licensee under a patent does not divide the benefits of his license by exercising his granted right of selling the licensed article.
[23] (b) Was there a sharing of the benefits? This question is answered by the observation that the sales to P. R. T. were within the permissive terms of the agreement. If the purchaser from a duly authorized licensee of a patented article who re-sells the same and makes a profit thereby, can be described as sharing with the licensee the benefits of his agreement, then P. S. B. can very properly be said to have shared the benefits of its license agreement with P. R. T. That is the only sense in which P. S. B. can be said to have shared with P. R. T. the benefits of the license agreement. The solicitors for R. C. A. do not of course contend that a sharing of benefits of that character is within the meaning *Page 432 
of the agreement which forbids the dividing and sharing of the benefits of the license. R. C. A.'s contention. I think, is reducible to this, that the sharing of benefits is shown by the fact that P. R. T. was not in the contemplation of equity a genuine, bona fide purchaser from P. S. B. of the licensed apparatus. My disagreement with that contention is disclosed by the views expressed under the preceding heads of discussion.
[24] 4. I now take up for consideration the question — What was the apparatus upon the selling price of which the parties agreed the royalties should be calculated? Having fixed the selling price to P. R. T. as the point where the royalty calculations are to be computed, it is now in order to answer the question just stated. The parties are in very pronounced difference upon it.
Before referring to the contract, two or three definitions of words appearing in it should be given. The original agreement licenses the manufacture and sale of Tuned Radio Frequency Receivers for certain limited uses. That is all that it licensed. A Tuned Radio Frequency Receiver is an apparatus which when energized is capable of receiving from the air desired or selected radio frequency signals and converting them into audio frequency signals. Speaking without any pretense to correct scientific terminology and using only the rather crude language of a layman untutored in the art and science of radio, the apparatus, when electrically energized, receives from the antenna radio frequency signals which in the raw state of their reception are incapable of reproduction for the human ear. Something must be done to them to transform them into signals that are capable of being reproduced in audible form. That, in the crude way of a layman's expression, is what I understand the function of the apparatus to be. When the transformation from radio signals to audio signals is complete, it is then possible, by means of a telephone head set or of another apparatus called a loud speaker, connected to the tuned radio frequency receiver, for the audio frequency signals to set in motion air vibrations and sound waves which are within the range of the human ear's receptivity. As a result of the air impulses set in motion by the vibrations in the telephone head set or in the loud speaker, the same kind of sound waves impinge upon the ear drums of the listener as were set in motion at the broadcasting point by an orchestra, speaker, singer, etc., and which at that end set an apparatus to work that caused the radio frequency signals to scatter into space. Thus, the audible sound waves of voice, instrument and at times of offensively realistic imitations of the noises of air planes, guns, street clamor, etc., which were launched at one location are figuratively speaking transported for great distances in the arms of radio signals. The radio frequency receiver reaches out and seizes the radio signals in their flight around the electrical circuit, and selects from them what it needs in order for the telephone head set or loud speaker to reproduce sound waves that will exactly correspond to the sound waves which had beat upon the microphone at the broadcasting station many miles distant.
The apparatus above described as a tuned radio frequency receiver, needs radio tubes for its functioning. They are a part of it. Its operation requires electric power. In the early practice of the art storage batteries were used to supply the power in the form of a direct current necessary for the functioning of the apparatus. In modern sets an apparatus has been devised to utilize the alternating current which is supplied from central generator plants as the source of power. Such current must be converted to a current of direct form. The apparatus that does this is called a battery eliminator. Most receiving sets are equipped with it.
The simple word receiver is commonly understood in the trade as including something more than a tuned radio frequency receiver. It takes in what is called a chassis. A chassis is a metal structure on which the tuned radio frequency receiver complete in all of its elements, except its tubes, is mounted. In other words a chassis plus tubes is a receiver in the trade sense of the word.
Then there is the loud speaker. That is no part of the receiver. In the absence of a telephone head set, it is, however, essential for the reproduction of sound to the ear.
A receiving set consists of receiver and loud speaker. The cabinet is not a neccessary component of a receiving set. A complete radio receiving set is a combination of loud speaker, battery eliminator or batteries, tubes and all else necessary for audible reception, including a cabinet when the combination is installed therein. A *Page 433 
complete radio receiving set is what is placed in the home or in automobiles, ready for immediate use by the ultimate consumer.
As stated before, the original license agreement authorized the manufacture and sale of Tuned Radio Frequency receivers. But, for royalty purposes, the contract made an arbitrary addition to the strict scientific meaning of the term. It provided that it "may include a cabinet, head set, loud speaker, battery eliminator, etc." The "etc." is important. Thus, the thing licensed under the patents was one thing, and the articles upon the selling price of which royalties were to be paid to the licensor for the privilege of manufacturing and vending the patented apparatus, was the thing licensed and more.
The license agreement was made by R. C. A. and others with William J. Murdock Co., an association of trust of Massachusetts. It was properly assigned by Murdock to P. S. B. on February 10, 1928. On October 31, 1930, a supplemental agreement was entered into between R. C. A. and P. S. B., so as to cover not alone Tuned Radio Frequency Receivers, but "all complete radio telephone receivers for radio amateur reception, radio experimental reception and radio broadcast reception." The significance of this change is that it extended Tuned Radio Frequency Receivers to include receivers of the superheterodyne or super-regenerative type, which the Murdock agreement had originally excluded. In the 1930 supplementary agreement the thing licensed for manufacture and sale is complete radio telephone receivers, not tuned radio frequency receivers. The word receivers with the broader meaning above referred to, was used. The definition of tuned radio frequency receiver which is found in the original Murdock license above quoted, was cancelled by this supplement of 1930. In its stead there was given a definition of the new expression — "radio broadcast receiver." It was defined as meaning "complete apparatus (but not separate parts thereof except for repairs or replacement in apparatus licensed hereunder) advertised as such and salable to the using public as such, which may include a cabinet, head set, loud speaker, battery eliminator, projector and screen; provided, however, that from and after the date hereof, radio tubes may be omitted at your (P. S. B.'s) election from such complete apparatus." It is to be observed that the original definition of 1928, supra, is here repeated except in two particulars, one important and the other unimportant for the purposes of this case. The unimportant particular is the addition of projector and screen among the articles that might be included in the defined phrase. The important particular is in the elimination of the "etc." before referred to.
On February 27, 1932, a further and final supplemental license agreement was entered into between R. C. A. and P. S. B. This agreement did not disturb the definition of radio broadcast receivers as found in the supplementary agreement of 1930. The 1932 supplement, however, introduced an important change in one respect that concerns the articles entering into the royalty base. Whereas by the 1930 supplement it was only receivers, advertised as such and salable to the using public as such, that constituted the minimum of the royalty base, and loud speakers were placed among the optional articles that might (may was the word of the contract) be included in the royalty burdened sales, in the 1932 supplement while receivers as a part of chassis were retained as royalty burdened, the minimum was enlarged to include loud speakers. In other words, the sale of loud speakers along with receivers (as a part of the chassis) was no longer optional with the licensee but mandatory.
Reading the 1930 and 1932 supplemental agreements together, I interpret the contract in its royalty provisions base to be as follows: the licensee shall pay the agreed royalty on radio broadcast receivers, which are agreed to include at least a chassis and loud speaker, and may, at the option of the licensee, include the sales therewith of cabinet, head set, battery eliminator, projector and screen, provided however that from time to time the licensee may omit tubes from the complete apparatus.
R. C. A. contends that from 1928 when the Murdock license was granted down to the present date, the original agreement and its subsequent modifications are to be interpreted as requiring the licensee to pay royalties on the selling price of complete radio receiving sets. I do not so interpret the writings. The phrase "complete set" does appear in R. C. A.'s letter of October 29, 1929, in relation to cabinet allowances; and in its letter of May 29, 1931, it speaks of a chassis and loud speaker as an "incomplete set." But the phrases are R. C. A.'s. These expressions do not appear in any agreements to which P. S. B. subscribed. *Page 434 
What complete set may mean is open to misunderstanding. In one sense of the word a receiver and loud speaker constitute a complete set, for they are capable of functioning alone as a complete reproducing unit when energized. Cabinets and their accessories serve only to contribute a bit of refinement to tone and appearance. The radio set is complete without them. A complete radio receiving set includes the cabinet and its accessories. A complete radio receiving set may also be spoken of as a complete set. Thus, "complete set" is susceptible of more than one meaning. It is of ambiguous import. If it occurred in the language of the contract and was shown to be the language of R. C. A., the general rule would require that it be construed most strongly against its author.
But it does not appear in the contract. "Complete" when used in the contract and its supplements is the modifier of other words. The expressions in the contract as supplemented are "complete * * * receivers," and "complete apparatus."
I look to the language of the contract for interpretative guidance. I have before stated the substance of the terms in which the 1930 and 1932 supplements leave the contract in respect of the articles entering into the royalty base. It embraces at least a chassis and loud speaker, and may include a cabinet, head set, battery eliminator, projector, screen and tubes. Since October 31, 1930, anything which P. S. B. sold in association with chassis and loud speaker which falls outside the description of any of the optional articles was not subject to royalty dues. Before 1930, when the "etc." concluded the list of articles which might come within the royalty base, there is room to contend that the present position of R. C. A. was entirely tenable, viz., that everything which entered into a complete radio receiving set, when sold by P. S. B., whether within the description of the specifically named articles or not, was subject to royalty payments. There is no occasion, however, to discuss whether that contention would be sustainable, because I do not understand the present controversy over the royalty to reach back to a period prior to October 31, 1930.
But that the thing which P. S. B. is to sell in association with chassis and loud speaker must include everything that goes to compose a complete radio receiving set, whether the set includes more than the things listed in the optional clause or not, is said by R. C. A. to be demonstrated by the provision that whatever it sells, it must include something which is "complete apparatus * * * advertised as such andsalable to the using public as such." The minimum which it must sell is a chassis and loud speaker. Those articles alone are certainly usable by the public as such. R. C. A.'s solicitors admit that they might be sold alone, if advertised as radio broadcast receivers. Together those two articles alone are capable of broadcast reception. If it be said that there is an implication that the usable articles which are sold must be advertised as such usable articles, it is to be answered that the contract does not say so. The phrase "advertised as such" is used. But it is to be observed that the person who is to do the advertising is not particularized. So far as the agreement states, any one may do the advertising. Of course no one would do it, except a person who would be interested in the sales which the advertisements were designed to stimulate. A purchaser from P. S. B. could and, if he were a distributor, doubtless would, do the advertising. That P. R. T. spent considerable sums in advertising Philco radios is uncontroverted. Its advertisements covered the complete radio receiving set, including receiver, loud speaker, battery eliminator, cabinet, and everything which is purchased by the ultimate consumer in the way of a radio set. In the composite thing which was advertised by P. R. T., the components purchased by it from P. S. B. were included. If a specially defined thing which is to be advertised as such furnishes a base for royalty computation, it does not follow that other things lying outside the special definition which are joined in the advertising are likewise within the royalty base. If so it would amount to transferring the problem of definitions from the contract between the parties, where it was specifically dealt with, to the uncertain and highly indefinite field of advertising material. That of course would be highly unreasonable.
[25] 5. Finally I come to the question of accounting. The parties make mutual demands for an accounting. They are agreed that an accounting is necessary and both desire it. The decree to be entered will require it. Whether it shall be provided for in the decree on the bill or on the crossbill, or in both, is a matter which the solicitors will doubtless be able to agree upon. *Page 435 
In the matter of accounting there are certain particulars with respect to which I am now sufficiently clear in my mind to express an opinion upon.
Royalties must be paid on P. S. B.'s selling price to P. R. T. As the selling price is the cost of manufacture plus five per cent., every item that enters into cost must of course be included in the computation of the selling price, whether paid directly by P. S. B. or not. There were payments that P. R. T. made to P. S. B. in consideration of the sales to it of the manufactured product which P. S. B. failed to include in its computation of costs. The portion of P. S. B.'s administrative costs which P. R. T. paid to P. S. B. fall in that category. So do P. S. B.'s royalty payments, which were reimbursed by P. R. T. Tools and dies which P. R. T. furnished to P. S. B. are likewise to be included in costs and handled according to sound accounting practice. As to P. S. B.'s reserves and inventory adjustments at the end of the year, they balance out the cost situation for royalty purposes from one year to another. If this item remains in controversy, it may be dealt with before the master. As to the cost of assembly work, P. S. B. must bear all that portion of it that pertains to the royalty-burdened articles that it sells, such articles being of the character hereinbefore indicated. As to cabinets, the allowance letters permit a deduction from the selling price to cover their cost. The formula for calculating the deduction from the selling price appears to present no difficulty in application. P. S. B. makes the cabinets either through itself or through a subsidiary and sells them to P. R. T. I suppose the latter places orders for cabinets in such numbers as will equal the number of chassis and speakers it requires. P. R. T. assembles the various components it has purchased in the cabinets. Now if P. S. B. were to sell to P. R. T. for illustration ten thousand chassis, ten thousand speakers, ten thousand battery eliminators, and ten thousand cabinets into which these articles are to be installed by the purchaser, making the sale of each lot of articles the subject of an individual transaction, it would seem that the several independent transactions ought to be treated as one, that is to say, as though there had been a single order for the various lots as one. All of those articles (in which the minima are enclosed) are things upon the selling price of which, when P. S. B. sells them, the agreement obligates P. S. B. to pay a royalty as the consideration for the license to use the patents. If the chassis, speaker and battery eliminator which P. R. T. buys from P. S. B. are intended by P. R. T. to be united in a single combination in a cabinet which it also buys from P. S. B. and P. S. B. knows that fact, then it might be said that in every essential of substance it is engaged in selling two things, viz., battery eliminator and cabinet, which are in the optional list along with the two articles that compose the minimum of permissible sales. If that is the situation, royalties would appear to be payable accordingly. That is the way it strikes me as a matter of first impression. If the parties are in disagreement about it, I am willing to hear it debated. I do not recall that it was discussed on the briefs, which appeared to agree upon this, that after the main points of controversy were settled by judicial determination, all disputed questions of accounting could be duly agitated before a master.
The question with respect to cabinets may prove of no importance in view of the fact that cabinet costs are in a general way deductible. But the formula for ascertaining the cabinet deductions may in its practical application make the question a practical one of whether cabinets when sold in the hypothetical manner above stated are to be considered in the royalty calculations. The matter of cabinets can be dealt with more fully before the master.
[26] The evidence touched upon the insulating member attached to the loud speaker. I think it is a part of the speaker and therefore is subject to royalty.
I think the observations found in this numbered topic and under 4 immediately preceding, are sufficient for the general guidance of the master in the accounting before him which will be ordered.
As to the decrees to be entered on the bill and cross bill, I assume that the solicitors for the respective parties will be able to agree on their form and terms, in the light of what has been said in the foregoing. If there is any disagreement over the proper decrees to be entered, the solicitors are invited to bring their differences before the court for settlement.
 *Page 150