Barry A. NORTON and Constance Norton, his wife, Defendants, Appellants,

v.

Andrew W. POPLOS and Virginia L. Poplos, his wife, Plaintiffs, Appellees.

Supreme Court of Delaware.

Submitted Dec. 15, 1981.

Decided March 11, 1982.

Garry G. Greenstein, of Berkowitz, Greenstein, Schagrin & Coonin, P. A., Wilmington, for defendants-appellants.

David Roeberg, of Roeberg & Associates, P. A., Wilmington, for plaintiffs-appellees.

Before DUFFY, McNEILLY and QUIL-LEN, JJ.

DUFFY, Justice:

The critical issue in this appeal concerns the right to rescind a contract for the purchase of real property. We conclude that the Court of Chancery should determine whether the buyer has a right to rescind the agreement on the basis of innocent misrepresentations by the seller and, for that reason, we reverse the judgment and remand the case to the Court of Chancery.

1. The property was owned by Mr. Poplos and his wife but, for convenience, we refer only to him in the opinion.

I

For present purposes, the pertinent facts are as follows:

Andrew W. Poplos[1] owned an improved lot in the Delaware Interstate Industrial Park which was subject to M–1 zoning. In September 1979, Poplos decided to sell the property and, for that purpose, he retained Phillip Berger, a real estate broker. As part of his effort to sell the property, Berger arranged for an advertisement in a local newspaper and also placed a sign on the property; both represented that the property was zoned M–1.

Barry A. Norton was president of a corporation which was in the business of blending, compounding, marketing and warehousing petroleum products and he was looking for a suitable site, with M–1 zoning, for relocation of the enterprise.[2] The newspaper advertisement of the Poplos property came to Norton's attention and he then contacted Berger.

Negotiations followed during which Berger became aware that Norton's business required "outside" storage for oils and lubricants in 55-gallon drums and in tanks with a capacity up to 9,000 gallons. Norton also discussed his business with Poplos who became aware (apparently) that Norton's business involved outside storage of petroleum products.

During a visit by Norton to the Industrial Park, materials were then stored outside the building located thereon. Poplos referred to restrictions limiting relocation of a loading dock (which Norton had planned to change) and Poplos indicated that he would, before settlement, provide Norton with a copy of the restrictions, if he could find them. The restrictions were never supplied by Poplos, nor was Norton ever informed by Poplos that the restrictions required prior approval by an industrial park building committee for many uses normally associated with M–1 zoning.[3] It ap-

2. Mr. Norton and his wife are parties to the contract in issue but, for convenience, we refer only to him in the opinion.

3. The New Castle County Zoning Code specifies the uses permitted in an M–1 zone. Gener-

pears that Berger had not been told by Poplos about the restrictions, as such.

Norton and Berger met at the offices of Norton's attorney; they discussed a contract of sale and Norton's proposed use of the property, including outside storage drums and tanks. Norton signed a New Castle Board of Realtors Standard Form Sales contract which contained the following pertinent printed provisions:

"3. ... Title to said property to be good marketable, fee simple title, free and clear of all liens and encumbrances of record, but subject to all existing easements and restrictions of record.

.    .    .    .    .

15. IN SIGNING this agreement, Purchasers and Sellers agree that they have read and fully understand this contract & furthermore they acknowledge that they do not rely on any written or oral representations not expressly written in this contract."

In addition, because of the perceived importance of the zoning to Norton's business purposes, the following clause was added to the agreement by his attorney:

"... contract contingent on property being zoned M–1 ...."

ally, the Code permits many types of light manufacturing uses in that zone. In pertinent part, the Code, at 1(8), permits any of the following uses:

"(a) Bottling works ...

....

(c) Open storage of building supplies, contractors' equipment or crated or baled material in connection with a wholesale establishment; but not including the open storage of junk, such as scrap metals or other scrap materials, or automobiles or other vehicles of machinery intended for dismantling or demolition.

(d) Storage of fuel, such as coal, coke or petroleum products, for retail purposes but not including storage in bulk of illuminating or natural gas.

(e) Freight terminal; sea, land or air.

.    .    .    .    .

(13) Warehousing.

(14) Wholesale sales with related storage and warehousing.

.    .    .    .    .

(17) Petroleum storage, subject to the Fire Prevention Code of the National Board of Fire Underwriters."

A title search made after execution of the contract disclosed a restriction requiring approval of the Industrial Park Building Committee for many improvements and uses.[4] Upon learning of the restrictions, Norton sought formal approval of the Building Committee for changes and uses required for his business. Approval was denied and, shortly thereafter, Norton's attorney notified Berger that he would be unable to purchase the property because of the restrictions.

Poplos then filed an action in the Court of Chancery for specific performance of the contract and Norton counterclaimed for rescission and cancellation thereof on the grounds of misrepresentation and breach of warranty.[5] Norton sought return of $5,000 which he had deposited when the contract was signed and $1,150 in attorney fees. After suit was started, but before trial, the property was sold to a third person and Poplos then abandoned his complaint for specific performance; the case went to trial on Norton's counterclaim.

The Chancellor concluded that the contract unambiguously provided that it was contingent only as to M–1 zoning of the

4. The recorded restrictions consist of seven legal-size pages which include the following statement:

"Uses incidental and subordinate to the principal use or building shall be permitted only on the same lot with the building to which they are accessory; shall be only such as do not alter the characters of the premises or impair neighboring premises; and, in the case of supplemental structures or outside storage prior approval of Delaware Interstate Industrial Park shall be pre-requisite to such use...."

The restrictions also provide that

"[a]ll fuel storage tanks shall be underground installations unless a specially screened alternative is approved."

Generally, the restrictions gave the Committee the right to regulate the particular use of any lot including: the making of exterior improvements, the use of outdoor storage, the location of street entrances or exits and the location of a loading dock.

5. At trial, the pleadings were amended to include an allegation of mutual mistake.

property and that the contingency language cannot be read to provide for any use permitted in an M–1 zone. He determined that, in the absence of mutual mistake, Norton assumed the risk of not being able to use the property as he had planned. Accordingly, he entered judgment for Poplos and Norton then docketed this appeal.[6]

Norton argues that the provision of the contract making the sale contingent on M–1 zoning was not met and, in the alternative, he says that he is entitled to rescission and cancellation as a result of fraud, misrepresentation or concealment of material facts by the seller's agent. The seller argues that the terms of the contract were met, that affirmative representations were not made to the buyer, that the buyer did not rely on any representations made by the seller or his agent and that certain arguments were not raised below or were subsequently abandoned.

## II

While we have considered all contentions made by the parties, our discussion is limited because we conclude that Norton is entitled to a remand for a determination of whether rescission of the contract should be ordered as a result of innocent misrepresentations made by the seller's agent.

### A.

▮ Essentially, the equitable remedy of rescission results in abrogation or "unmaking" of an agreement, and attempts to return the parties to the *status quo*. Common grounds for rescission of a contract for the sale of real property include fraud, mis-

representation and mistake. 8A *Thompson on Real Property* § 4465 pp. 366, 367 (1963). But in addition to rescission for fraudulent misrepresentation, *Williston on Contracts* § 1487 p. 322 (3rd Ed. 1970), rescission also may be granted under certain circumstances for innocent misrepresentations made by a seller.[7] Thus, as stated by Professor Williston:

"It is not necessary, in order that a contract may be rescinded for fraud or misrepresentation, that the party making the misrepresentation should have known that it was false. Innocent misrepresentation is sufficient for though the representation may have been made innocently, it would be unjust and inequitable to permit a person who has made false representations, even innocently, to retain the fruits of a bargain induced by such representations."

*Williston, supra,* at § 1500, pp. 400, 401. Similarly, the recently promulgated *Restatement 2d of Contracts,* § 164, states that,

"If a party's manifestation of assent is induced by either a fraudulent *or material* misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient." (Emphasis added.)

*See also Restatement 1st of Contracts,* § 476 (1932). Most American jurisdictions which have addressed this issue appear to recognize that an innocent material misrepresentation by a vendor which induces the sale of the property is ground for rescission of the contract. *Thompson, supra,* § 4472, pp. 401, 402.[8] In addition to ordering re-

---

6. The Chancellor also concluded that mutual mistake had not been shown and that Norton had abandoned some of his theories for rescission, including misrepresentation. While it is true that Norton did not argue those theories in post-trial briefing, they were raised in the pleadings and were argued at trial. As such, they were fairly presented to the Trial Court, as required by Supreme Court Rule 8.

7. At least one Delaware court has stated that a *court in equity does not have jurisdiction to grant rescission of an executed contract absent proof of fraud. Holley v. Jackson,* Del.Ch., 39 Del.Ch. 32, 158 A.2d 803 (1959). We merely

note that the contract here in issue was executory.

8. *See e.g. Cousineau v. Walker,* Alaska Supr., 613 P.2d 608 (1980); *Clark v. Kirsner,* Md.Ct. App., 196 Md. 52, 74 A.2d 830 (1950); *Yorke v. Taylor,* Mass.Supr., 332 Mass. 368, 124 N.E.2d 912 (1955); *Magnuson v. Bouck,* Minn.Supr., 178 Minn. 238, 226 N.W. 702 (1929); *Parkhill v. Fuselier,* Mont.Supr., 632 P.2d 1132 (1981); *Russo v. Williams,* Nebr.Supr., 160 Neb. 564, 71 N.W.2d 131 (1955); *Junius Constr. Corp. v. Cohen,* N.Y.Ct.App., 257 N.Y. 393, 178 N.E. 672 (1931); *Slocum v. Leffler,* Or.Supr., 272 Or. 700, 538 P.2d 906 (1975); *Halpert v. Rosenthal,*

scission, a court will generally direct that a down payment by a buyer be returned on a theory of restitution. *See Restatement 1st of Restitution*, § 55 (1937); *Dobbs, Handbook on the Law of Remedies*, § 4.1, p. 222 (1973).

A misrepresentation need not be in the form of written or spoken words. Stated simply, a misrepresentation is merely an "assertion not in accordance with the facts," *Restatement 2d of Contracts*, § 159, and such an assertion may be made by conduct as well as words. *Id.* Comment a. And although a statement or assertion may be facially true, it may constitute an actionable misrepresentation if it causes a false impression as to the true state of affairs, and the actor fails to provide qualifying information to cure the mistaken belief. *See Equitable Life Ins. Co. v. Halsey Stuart & Co.*, 312 U.S. 410, 61 S.Ct. 623, 85 L.Ed. 920 (1941); *McGlothin v. Nichoalds*, D.Colo., 212 F.Supp. 757 (1962), *aff'd*, 330 F.2d 454 (10 Cir. 1964); *Borzillo v. Thompson*, D.C. Mun.Ct.App., 57 A.2d 195, 198 (1948). Stated another way,

"[a] statement may be true with respect to the facts stated, but may fail to in-

clude qualifying matters necessary to prevent the implication of an assertion that is false with respect to other facts. For example a true statement that an event has recently occurred may carry the false implication that the situation has not changed since its occurrence. Such half-truth may be as misleading as an assertion that is wholly false."

*Restatement 2d of Contracts*, § 159, comment b.

### B.

Turning now to the case before us, it appears that the advertisement and the sign indicating that the property was zoned M–1 may be the kind of assertion to which we have just referred.[9] In our opinion, a finder of fact could conclude that, to the average purchaser with a rudimentary knowledge of the New Castle County Zoning Code or, indeed, to one who knows the Code, such an assertion amounts to a representation that the property can be used for the purposes which the Code permits in an M–1 zone, that is, for typical light manufacturing uses.[10] But the reality is that what

R.I.Supr., 107 R.I. 406, 267 A.2d 730 (1970); *Miller v. Reynolds*, Va.Supr., 216 Va. 852, 223 S.E.2d 883 (1976); *Whipp v. Iverson*, Wis. Supr., 43 Wis.2d 166, 168 N.W.2d 201 (1969).

9. In his opinion the Chancellor considered the reference to M–1 zoning only as a condition in the contract of sale; he did not rule on whether the seller, directly and/or through his agent, represented that M–1 uses were permissible.

10. We note the following in the record:
Mr. Greenstein, Norton's attorney, stated in his testimony:
"Q In other words, you have never seen restrictions where as part of a planned development someone would not be able to use the property for their intended use?
A No, that's not what I said. What I have never seen is a piece of ground that was restricted so that it couldn't because for the purpose for which it was zoned at all. I mean, this was a complete negation of M–1 zoning."
Mr. Berger, the seller's agent, candidly stated:
"Q Would you agree with me that with respect to the Nortons, it would be foolish of them to purchase this property if their intended use was to operate Norton Petroleum

Corporation and then couldn't have outside storage and the building occupied only 10% of the property?
A Correct.
Q Did the fact that the property was referred to as an industrial park also lead you to assume that outside storage would be permitted?
A Yes, Sir.
Q Is that common in the trade, when somebody says they have an industrial park, that you can have outside storage?
A Yes, Sir.
Q Were you surprised when you found that the restrictions prohibited outside storage without [committee] approval?
A Yes, Sir.
Q In your experience, have you ever seen restrictions applicable to an M–1 property that prohibited outside storage without prior approval?
A No, Sir.
Q Other than this case?
A No, Sir.

.     .     .     .     .

Q You have testified that the M–1 contingency, which is contained in Paragraph 11, meant that the property was zoned M–1 on the zoning map. Do you recall that testimony?

M–1 zoning permitted, the restrictions effectively prohibited without special approval of the Building Committee. Consequently, without qualifying information in the advertisement or on the sign, or disclosure of the nature of the restrictions, the assertion that the property was zoned M–1 may constitute a misrepresentation of fact within the principles of law stated above. We agree with Poplos that neither fraud nor mutual mistake has been shown. In our opinion, on the present record, any misrepresentations made by Poplos or Berger were innocent.

■ We do not mean to say, however, that such a representation alone would entitle Norton to a judgment. On the contrary, if Norton is to recover his down payment he must persuade the Trial Court that the misrepresentation was material, that it induced him to execute the contract, and that his reliance on the misrepresentation was justified. *Restatement 2d of Contracts*, §§ 162, 164, *Williston, supra,* §§ 1490, 1511, 1515.

### III

Finally, we consider several other matters raised in the appeal.

#### A.

■ First, it is not a defense under Delaware law that the misrepresentation in issue was made by Berger because one who delegates the power to act is responsible for what is done pursuant to that authority. *Mechell v. Palmer*, Del.Supr., 343 A.2d 620, 621 (1975); *Philadelphia Storage Battery Co. v. Radio Corp. of America*, Del.Ch., 22 Del.Ch. 211, 194 A. 414, 429 (1937). Nor may a seller assert the innocence or lack of knowledge of the agent as a defense. Compare *Brandywine Volkswagon Ltd. v. State*

A  Yes, sir.
Q  Would you also agree that the statement in the contract in Paragraph 11 to the effect that 'Contract contingent on property being zoned M–1' was shorthand for the understanding that the property would also be usable for those things which are permitted in M–1 under the zoning code?
A  I would agree with that, yes, sir.

*Dept. of C. A.*, Del.Supr., 312 A.2d 632, 634 (1973), in which this Court, in an action based upon violation of a consumer protection statute, stated that,

> "[the vendor] is the party charged with violation of the statute, not the salesman and [the vendor] cannot avoid its responsibility under the law by pleading the salesman's ignorance. It is [the vendor's] duty to see that its salesmen have whatever pertinent knowledge that is chargeable to the company."

Similarly, Poplos could not avoid a duty to inform Berger, his agent, of restrictions or defects of which he was aware and that may have been material to one seeking to purchase the property.

#### B.

■ Second, Poplos argues that Norton's claim is barred by a "merger" clause which, in essence, states that the parties have read and understood the contract and that "they do not rely on any written or oral representations not expressly written in [the] contract." It is clear, however, that a merger clause does not preclude a claim based upon fraudulent misrepresentations. *Slater v. Berlin*, D.C.Mun.Ct.App., 94 A.2d 38, 43 (1953); *Ortel v. Upper Ashburton Realty Co.*, Md.Ct.App., 171 Md. 678, 190 A. 239, 242 (1937). The law is not quite so clear, however, with respect to the effect of such a clause on an innocent or honest misrepresentation. Although we are aware of authority to the contrary, *cf. Wilkinson v. Carpenter*, Or.Supr., 276 Or. 311, 554 P.2d 512 (1976), we follow the better rule which is this: even if a sales contract contains a merger clause, a buyer may rescind the contract if it resulted from an innocent but material misrepresentation by a seller. As the Rhode Island Supreme Court has stated:

> Q  In other words, that is what the parties intended?
> A  Yes, sir, I think so.
> Q  Would you agree that they intended something more than merely that the property be registered as M–1 on a zoning map; namely, that it also be usable as M–1?
> A  Usable under the M–1 zoning classification."

"[T]he availability of the remedy of rescission is motivated by the obvious inequity of allowing a person who has made an innocent misrepresentation to retain the fruits of the bargain induced thereby. If we are to permit a party to rescind a contract as a result of an innocent misrepresentation, the 'boiler plate' found in the merger clause shall not bar the use of this remedy."

*Halpert, supra,* 267 A.2d at 735. *See also Parkhill v. Fuselier, supra,* and *Glendale Corp. v. Crawford,* Md.Ct.App., 207 Md. 148, 114 A.2d 33 (1955).

### C.

We also conclude that Norton's right to rescission of the contract is not barred by a boiler plate provision that title to the property in question is "subject to all existing encumbrances and restrictions of record." A Delaware Court has held that the doctrine of constructive notice will not protect a vendor who has made a fraudulent misrepresentation or "concealment of a material fact" with respect to recorded encumbrances on a given property. *Holley, supra,* 158 A.2d at 807. And Courts in other jurisdictions have held that a buyer who justifiably relies on a fraudulent misrepresentation of the seller is under no duty to examine the public record to learn the true state of affairs. *Chesapeake Homes, Inc. v. McGrath,* Md.Ct.App., 249 Md. 480, 240 A.2d 245 (1968); *Suraci v. Ball,* Pa.Super., 160 Pa.Super. 349, 51 A.2d 404, 405 (1947). We see no reason why a court of equity should enforce a standard "boiler plate" provision that would permit one who makes a material misrepresentation to retain the benefit resulting from that misrepresentation at the expense of an innocent party.

### D.

Because we find that the misrepresentations by the seller were not fraudulent, each side will be responsible for its own attorney's fees and costs. As such, the Trial Court's denial of an award of attorney's fees was proper.

For the reasons stated herein, the judgment is affirmed in part, reversed in part and the case is remanded for such proceedings consistent herewith as the Court of Chancery deems necessary.