

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-30-2004

# SC Johnson & Son Inc v. DowBrands Inc

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-2572

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"SC Johnson & Son Inc v. DowBrands Inc" (2004). *2004 Decisions.* Paper 309.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/309

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 03-2572

———————

S.C. JOHNSON & SON, INC.


v.


DOWBRANDS INC.; DOWBRANDS L.P.;
DOW CHEMICAL COMPANY,

Appellants

———————

On Appeal from the United States District Court
for the District of Delaware
(Civil Action No. 00-CV-0444)
District Judge: Hon. Joseph J. Farnan, Jr.

———————

Argued: June 23, 2004

———————

Before: NYGAARD, McKEE, and CHERTOFF, <u>Circuit Judges</u>.

(Opinion Filed: September 30, 2004)


1

MICHELE L. ODORIZZI, ESQ. (Argued)
Mayer, Brown, Rowe & Maw
190 South LaSalle Street
Chicago, IL 60603

KENNETH J. NACHBAR, ESQ.
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
Attorneys for Appellants


MAURICE J. MCSWEENEY, ESQ. (Argued)
Foley & Lardner
777 East Wisconsin Avenue
Suite 3900
Milwaukee, WI   53202

ALLEN M. TERRELL, JR., ESQ.
ANNE S. GAZA, ESQ.
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE   19899
Attorneys for Appellee


OPINION OF THE COURT


McKEE, Circuit Judge.

Plaintiff S.C. Johnson & Son, Inc. ("SCJ"), purchased the assets of defendant

DowBrands, Inc., pursuant to a written agreement with DowBrands, Inc.,  as well as co-

2

defendants DowBrands, L.P., and Dow Chemical Company, Inc. (collectively referred to as "Defendants"). SCJ later sued Defendants for fraud alleging that they had fraudulently misrepresented the distribution of Defendants' products in Latin America. SCJ alleged that Defendants breached the Purchase Agreement by refusing to indemnify SCJ for costs incurred as a result of a patent infringement suit brought against SCJ by a third party. The district court found for SCJ on both of these claims. The court held that a non-reliance clause in the Purchase Agreement did not preclude suits for fraud, and that the amount of the indemnification was not subject to the $10 million deductible or "basket" in the Agreement. For the reasons stated below, we will reverse the district court insofar as it ruled in favor of SCJ on its fraud claim, but we will affirm the court's ruling that SCJ is entitled to indemnification for its attorney's fees. However, we also conclude that the indemnification is subject to the deductible.[1]

## I. Background

Beginning at least in 1992, DowBrands, Inc., and DowBrands, L.P., (together, "DowBrands") became aware of distribution problems it was having with products it was shipping to Latin America. DowBrands believed that goods it was earmarking for distribution in Latin America were being diverted to U.S. markets. In 1996, Linda Esposito, DowBrands' Vice President for North and Latin America, hired Edward Francis to survey DowBrands' Latin American business. Over the next year, Francis investigated

---

[1] The amount of the attorney's fees was less than the amount of the deductible.

3

the Latin American business and met with Jose Berdasco, DowBrands' Sales Manager for Latin America, as well as Jesus Cutie, the head of one of DowBrands' two largest distributors in Latin America. After Francis reported back to Esposito, DowBrands retained Euromonitor International, Inc., to examine the extent of its Latin American business. In January 1997, Euromonitor reported that it was not able to find any DowBrands products in a random sample of stores in Argentina, Brazil or Chile. In July 1997, DowBrands terminated its agreement with its largest Latin American distributor because DowBrands was concerned that the distributor was diverting products intended for Latin America to the U.S.

At the same time, Dow Chemical Company, Inc., decided to sell DowBrands' assets, and it prepared an offering memorandum for potential buyers that it distributed in July 1997. The memorandum stated that DowBrands' Latin American sales accounted for $18.6 million and that its total sales were $764.2 million in 1996. DowBrands also projected sales of $15.7 million in Latin America for 1997. SCJ was among the companies that made preliminary bids for the assets of DowBrands after receiving that memorandum.

After submitting its bid, SCJ began its due diligence. SCJ reviewed voluminous documents that Defendants placed in two "data rooms." SCJ also interviewed DowBrands' employees, and attended a presentation that DowBrands' management conducted for bidders. During its due diligence, SCJ discovered that DowBrands

4

conducted its business in Latin America solely through third-party distributors, and that the company itself had no employees in Latin America. In addition, SCJ reviewed the Euromonitor study that discussed the penetration of DowBrands' products in the Latin American market. However, DowBrands' management never mentioned diversion during its presentation to bidders.

Marc English, SCJ's Director of Acquisitions, attended the management presentation. Significantly, English wrote: "diversion?" in his printed copy of the presentation summary next to bullet points about the Latin American distributors. Moreover, in his memorandum summarizing his key due diligence findings regarding Defendants' international business, English wrote that: "Dow has two Latin American Distributors based in Miami – potential exists for water goods."[2]

At the conclusion of its due diligence, SCJ made a final bid of $1.1 billion for DowBrands' assets which, after negotiations, was increased to $1.125 billion. However, a few days before the Purchase Agreement was to be executed, Defendants sent SCJ about fifty pages of material including a copy of the July 1997 letter by which DowBrands had terminated its largest Latin American distributor because of concerns that the distributor was diverting products intended for Latin America to the U.S. Nevertheless, the Purchase Agreement was signed a few days later and closing was scheduled for January 1998.

---

[2] "Water goods" is a synonym for "diverted goods."

A few days before the closing actually occurred, Esposito and two other DowBrands vice-presidents were informed of the results of a diversion detection program that DowBrands set up in 1997. Pursuant to that program, 174 coupons had been placed in selected sealed cases of DowBrands' products that were to be distributed in Latin America. These coupons stated that they could be redeemed for $50 by contacting DowBrands and identifying the store and case where the coupon had been found. Twenty-two of these coupons were later redeemed in the U.S. rather than Latin America, the intended place of distribution. After getting this information, one of DowBrands' other vice-presidents told Esposito and another vice-president that this confirmed diversion from the Latin American market. However, they agreed that the vice-president who would be meeting with SCJ officials prior to closing should not disclose the program or its results unless specifically asked. Despite concerns that had been raised at SCJ regarding diversion, no one from SCJ inquired about it during the subsequent pre-closing meeting with the DowBrands' vice-president, and he did not volunteer any information about the program or its results.

Prior to closing, SCJ put Michael Caron in charge of transitioning the international part of DowBrands' business. On January 16, 1998, Caron met with Berdasco (DowBrands' sales manager for Latin America), to discuss sales in Latin America. Caron asked Berdasco for retailers' names, retail distribution grids, and sales data by region and country. Berdasco said that he could not provide the information but indicated that one of

6

his major distributors could. Berdasco told Caron that he would have the information forwarded.

However, SCJ completed the purchase of DowBrands' assets on January 23, 1998 without waiting for the information from Berdasco. Thus, Caron did not have the information he requested from Berdasco when the deal closed. In addition, as of the date of the closing, DowBrands terminated another of its major Latin America distributors, stating that it was aware that the distributor was diverting DowBrands products in breach of a distribution agreement. Four days after the closing, SCJ officials again met with Berdasco and asked for the list of retailers who sold DowBrands products in Latin America. Berdasco informed them that he still did not have the list. One of the SCJ officials replied by asking Berdasco if "it would be safe to assume that 80-90 percent of the business never left Miami and never left the United States[.]" Berdasco did not respond verbally, but shrugged and smiled in a manner that the SCJ officials interpreted as affirmation.

SCJ then had its Latin American employees conduct a survey to see whether they could find any DowBrands products in the stores there. After about two to three weeks, the employees reported that they found no DowBrands' products in Latin America, except for a few in Venezuela. Moreover, in the five months following the sale, SCJ sold no DowBrands products in Latin America, and in the seventeen months following the sale, SCJ sold only about $1 million worth of DowBrands' products there.

7

In the spring of 1998, Tenneco Packaging and Specialty Products, Inc., sued SCJ to enjoin it from selling the Slide-Loc storage bag line of products alleging that the Slide-Loc line infringed its patents. DowBrands had developed this line in 1997 and sold it to SCJ under the aforementioned Purchase Agreement. SCJ notified Defendants of the Tenneco suit and demanded indemnification under the Purchase Agreement. However, Defendants refused arguing that Tenneco's suit was not covered by the indemnification clause.

## A. Relevant Terms of the Purchase Agreement

Under the terms of the Purchase Agreement, Defendants expressly renounced all warranties not expressly set forth in the Agreement. In addition, the Purchase Agreement provided that SCJ was not buying any of DowBrands' existing contracts with Latin American distributors. Section 10.10 of the Agreement provided:

> Entire Agreement. This Agreement (including the documents and instruments referred to in this Agreement) sets forth the entire understanding and agreement between the parties as to the matters covered in this Agreement and supersedes and replaces any prior understanding, agreement or statement of intent. *Purchaser acknowledges that it has conducted its own independent review and analysis of the Business and the Transferred Assets and that it has been provided access to the properties, records and personnel of Sellers for this purpose. In entering into this Agreement, Purchaser has relied solely upon its own investigation and analysis and the representations and warranties set forth in this Agreement* and acknowledges that (a) none of Sellers or any of their respective Affiliates, directors, officers, employees, agents, representatives or advisors makes any representation or warranty, either express or implied, as to the accuracy or completeness of (and agrees that none of such persons shall have any liability or responsibility to it in respect of) any of the information, including without limitation any projections, estimates or budgets, provided or made available to Purchaser or its agents or representatives, except and only to the extent expressly

8

provided for in this Agreement.  Nothing in this section 10.10 is intended to preclude any remedy for fraud or limit any right of Purchaser with respect to any breach of or inaccuracy in any representation or warranty in this Agreement.

R. at 248. (Emphasis added).

The Agreement also provided for the transfer of intellectual property necessary to conduct DowBrands' business and, as we have noted, it provided for indemnification for lawsuits arising from any breach of its terms.  Section 3.15 of the Agreement discussed the transfer of intellectual property:

> Intellectual Property.  (a) The Transferred Intellectual Property . . . includes all intellectual property rights necessary for or used in the conduct of the Business as currently conducted. . .   Except for [certain exceptions], (I) Sellers are the sole and exclusive owners of all rights to, or have a license that is in full force and effect to, the Transferred Intellectual Property, . . .and (ii) there is no claim by any Person or any Proceeding pending or, to the knowledge of the Sellers, threatened which relates to the use of any of the Transferred Intellectual Property in the Business as currently conducted and as presently proposed to be conducted, or the validity or enforceability of the Transferred Intellectual Property or the rights of Sellers therein.

R. at 213-14.

Sections 9.01, 9.03 and 9.04 pertained to indemnification.  Section 9.01 stated:

> Indemnification by Sellers.  From and after the Closing and subject to the provisions of this Article IX (including the limitations set forth in Section 9.04) , Sellers agree to . . . indemnify fully, . . . and defend each Purchaser Indemnified Party from . . . any and all claims . . . (including reasonable attorneys' fees) (collectively, "Damages") arising out of or relating to: (a) any inaccuracy or breach of any representation or warranty of Sellers contained in this Agreement; (b) any breach of any covenant or agreement. . . of Sellers contained in this Agreement . . . .

R. at 237.

9

Similarly, Section 9.03 provided:

Indemnification Process. . . . (a) In the event that (I) any claim . . .is instituted by any Person other than the parties to this Agreement or their Affiliates which could give rise to Damages for which an Indemnifying Party could be liable to an Indemnified Party under this Agreement . . . (such claim, demand or proceedings, a "Third Party Claim") . . . , the Indemnified Party shall with reasonable promptness send to the Indemnifying Party a written notice specifying the nature of such claim, demand or Proceedings and the amount or estimated amount thereof. . . .
(b) . . . [I]n the event of a Third Party Claim, the Indemnifying Party shall be entitled to control the defense of such Third Party Claim and to appoint counsel of the Indemnifying Party's choice at the expense of the Indemnifying Party to represent the Indemnified Party . . . The Indemnifying Party shall . . . pay the reasonable fees and expenses of counsel retained by the Indemnified Party (provided that such counsel is reasonably acceptable to the Indemnifying Party) if . . . (iii) the claim seeks an injunction or equitable relief against the Indemnified Party[.]

R. at 239-40.

Finally, Section 9.04 provided:

Limitations on Indemnity Payments. Other than with respect to Taxes, no claim for indemnification under sections 9.01(a) or Section 5.01 may be made, and no payment in respect thereof shall be required unless the aggregate amount of Damages against which the Purchaser Indemnified Parties are entitled to be indemnified exceeds $10 million (and then only for the amount of such excess). The maximum aggregate amount of Damages against which the Purchaser Indemnified Parties shall be entitled to be indemnified under Sections 9.01(a) and (b) with respect to all claims thereunder shall be $400 million.

R. at 242.

## B. Procedural History

SCJ eventually sued Defendants alleging that they had committed fraud by

deceiving SCJ about the diversion of DowBrands products earmarked for distribution in

Latin America. SCJ also claimed that it was entitled to indemnification for attorney's fees arising from the 1998 Tenneco patent infringement action.

The district court granted SCJ summary judgment on its indemnification claim, and later awarded SCJ $7.035 million as reimbursement for SCJ's attorney's fees.[3] It then held a bench trial on the fraud claim, after which it found that Defendants had made fraudulent misrepresentations to SCJ about DowBrands' Latin American business, and it awarded SCJ $21.948 million in damages. That represented the difference between the true value of the Latin American business and the price SCJ paid for it.[4] This appeal followed.[5]

## II. Discussion

Defendants raise four arguments on appeal. They argue that the district court erred in concluding that Section 10.10 of the Agreement does not bar SCJ's fraud claim. Assuming that Section 10.10 does not bar the fraud claim, Defendants argue that the fraud claim is not meritorious because SCJ did not justifiably rely on their representations

---

[3] The court also held that the amount of indemnification SCJ was entitled to was not subject to the $10 million deductible.

[4] Defendants requested that the court offset these damages by the alleged increase in the value of the North American business that was masked by the diversion, but the court refused.

[5] We have jurisdiction over the district court's rulings in this case pursuant to 28 U.S.C. § 1291 because the court properly exercised its jurisdiction to hear this case under 28 U.S.C. § 1332 and has issued a final judgment. On appeal, we are asked to examine only legal issues, over which we exercise de novo review. *Henglein v. Colt Indus. Operating Corp.*, 260 F.3d 201, 208 (3d Cir. 2001).

11

about Latin American sales. Defendants also argue that the district court improperly calculated damages relating to the fraud claim because the court failed to offset the decreased value of the Latin American business by the resulting increase in value of the U.S. business that would have been masked by any diversion. Finally, Defendants argue that the court erred in holding that it was contractually obligated to indemnify SCJ for the costs of defending the Tenneco patent infringement action. Alternatively, Defendants claim that, even they were obligated to indemnify SCJ, the amount of the indemnification should have been reduced pursuant to the $10 million "basket" contained in the indemnification clause.[6] We review these arguments seriatim.

## A. Is SCJ's Fraud Claim Barred Under the Purchase Agreement.

Defendants argue that the broad disclaimer contained in Section 10.10 of the Purchase Agreement prevented SCJ from bringing a fraud claim. That disclaimer clearly provided that SCJ was not relying upon Defendants' disclosures, but was relying on its own investigation instead. However, the district court rejected that position based upon the court's interpretation of the last sentence of the section. As set forth above, that provision states: "Nothing in this Section 10.10 is intended to preclude any remedy for fraud or limit any right of Purchaser with respect to any breach of, or inaccuracy in, any representation or warranty in this Agreement." The court also refused to accept the non-

---

[6] Since the amount of the attorney's fees did not exceed the amount of the deductible, Defendants would owe nothing if correct.

12

reliance provision based upon its conclusion that provisions such as Section 10.10 do not bar fraud claims as a matter of Delaware law under *Norton v. Poplos*, 443 A.2d 1 (Del. 1982). R. at 36-37.

*Norton* is a 22-year-old Delaware Supreme Court case that appears to categorically hold that non-reliance provisions in contracts will not bar subsequent actions for fraud. 443 A.2d at 6. However, any attempt to apply *Norton* is complicated by a line of later cases decided by the Delaware Chancery Court allowing sophisticated parties to waive their right to bring fraud claims when a freely negotiated contract states their intention to do so. *See H-M Wexford, L.L.C., v. Encorp, Inc.,* 832 A.2d 129, 142-43 (Del. Ch. 2003); *Great Lakes Chemical Corp. v. Pharmacia Corp.*, 788 A.2d 544, 556 (Del. Ch. 2001).[7]

After concluding that SCJ could maintain a fraud action under Delaware law despite the language of Section 10.10, the district court proceeded to determine whether the record supported SCJ's purported reliance on representations regarding the size of DowBrands' Latin American business. *See Stephenson v. Capano Dev. Co., Inc.,* 462 A.2d 1069, 1074 (Del. 1983). In concluding that the record supported SCJ's claim and that SCJ had carried its burden, the district court focused on the thoroughness of SCJ's

---

[7] *See also Kronenberg v. Katz*, 2004 WL 1152282 at *19-20 (Del. Ch. May 19, 2004) (unpublished opinion); *St. James Recreation, LLC v. Rieger Opportunity Partners, LLC*, 2003 WL 22659875 at *3 (Del. Ch. Nov. 5, 2003) (same); *Progressive International Corp. v. E.I. DuPont De Nemours & Co.*, 2002 WL 1558382 at *1, *7 (Del. Ch. Jul. 9, 2002) (same). In their briefs and at oral argument, the parties focused on the extent to which the prohibition in *Norton* is still viable despite this contrary authority.

due diligence. The court explained:

> First, the Court notes that under Delaware law "the purchaser of a business is under no duty to investigate the accuracy of representations made by the seller concerning its profitability and operational affairs, even when there is an opportunity to do so." *Craft v. Bariglio*, 1984 WL 8207 at *10 (Del. Ch. Mar. 1, 1984). Additionally, under Delaware law, a buyer's independent review or investigation will not preclude reliance on the seller's representations unless the investigation was so thorough and complete as to be "of such a character as to fully acquaint him with the essential facts." *Omar Oil & Gas v. MacKenzie Oil Co.*, 138 A. 392, 397 (Del. 1926). Also, "if only a partial investigation is made, under proper circumstances, a party may rely on another's representation to his detriment particularly where the other person has superior knowledge." *Lock v. Schreppler*, 426 A.2d 856, 861-62 (Del. Super. Ct. 1981) [].

R. at 109.

The district court concluded that "SCJ had no affirmative duty to investigate diversion in Latin America" and that SCJ reasonably and justifiably concluded that SCJ's pre-sale survey finding no DowBrands' products on the shelves in Latin America did not amount to a full investigation. The court therefore reasoned that, under *Omar Oil and Gas,* SCJ was entitled to rely on Defendants' other representations concerning sales to Latin America because Defendants had superior knowledge of the Latin American business. R. at 109-10. The court also focused on the fact that the Euromonitor study finding no products on the shelves of Latin American stores was "noncopyable" and "part of a document that was more than one hundred pages[,]" implying that SCJ could not reasonably have been expected to ferret-out that information. *Id.*

Defendants contend that, even if SCJ can avoid the non-reliance language in Section 10.10, it knew enough about the problem of diversion to preclude any reasonable

14

reliance on Sellers' disclosures given the language of the Purchase Agreement. We agree.

Under certain circumstances, buyers can rely on the representations of sellers without incurring a duty to investigate. For example, in *Craft*, the Delaware Supreme Court stated:

> Where a representation is made of a fact (as distinguished from an expression of opinion), and relates to a matter as to which the parties have not equal means of information, but is peculiarly within the knowledge of the person making the representation, the person receiving and acting upon it in the making of a contract has an absolute right to rely on the truthfulness of the representation, and is not required to seek means of information to determine its falsity, although such means are available. Under this rule, representations may be fully relied on without investigation, and are legally equivalent to a warranty of the matter referred to, when made by the seller of a business concerning the profits which he has received from it in the past . . . .

*Id.* at *8-*9 (quoting Black, *On Rescission And Cancellation* (2d ed.) § 118).

Thus, *Omar Oil & Gas* held that buyers were entitled to rely on a seller's material representations. 138 A. 392, 397 (Del. 1926). The situation here is very different. SCJ specifically agreed to rely only upon its own due diligence rather than relying upon any information it received from Defendants. Moreover, during its due diligence, SCJ was alerted to the likelihood of diversion. Given SCJ's contract, the fact that Defendants knew about the diversion of products earmarked for Latin America and chose not to volunteer the information to SCJ despite multiple opportunities to do so is far less relevant to our

15

fraud analysis than might otherwise have been the case.   This is true regardless of the current viability of *Norton*.

Although SCJ complains that critical information such as the Euromonitor Study was buried amongst the voluminous documents in a "data room," SCJ actually found that study, reviewed it, and specifically noted the very problem of diversion it now claims Defendants hid from it.  Defendants also gave SCJ direct access to DowBrands' sales manager for Latin America.  SCJ asked him (Berdasco) the right questions.  Those questions were clearly focused on SCJ's concern about the likelihood of diversion from Latin American markets.  However, as noted above, SCJ was content to proceed to closing without waiting for answers.  SCJ proceeded to closing even though it knew that Defendants were not warranting anything about DowBrands' Latin American distribution and that SCJ had agreed to rely only upon its own due diligence.[8]

Moreover, SCJ knew from the Euromonitor study that no DowBrands' products had been found in a survey of stores in Argentina, Brazil or Chile.  It is, of course, true that Defendants withheld relevant information from DowBrands' coupon seeding program just as SCJ argues.  However, the coupon program, had it been disclosed, would simply have confirmed SCJ's suspicions from such sources as the Euromonitor study.

---

[8] We have already explained that SCJ's notes and communications establish that key people conducting due diligence, including Director of Acquisitions (Marc English) and its Director of Transitioning (Michael Caron), both suspected diversion of products meant for Latin America was occurring.

16

This all occurred against the backdrop of SCJ's agreement to conduct "its own independent review and analysis of the [DowBrands'] Business and the Transferred Assets[.]" SCJ also agreed that it was "[relying] solely upon its own investigation and analysis and the representations and warranties set forth in [the Purchase] Agreement." R. 248.

SCJ is now asking us to redraft its Purchase Agreement with Defendants and allow it to rely on Defendants' allegedly incomplete and/or misleading disclosures. However, we can not ignore the express language of the Purchase Agreement, and we will not redraft it by allowing SCJ to rely upon Defendants' disclosures or to insist that its reliance was reasonble despite the language of Section 10.10. The Purchase Agreement makes no mention of DowBrands' Latin America sales and certainly gave SCJ no warranty regarding those sales. In addition, the same provision of the Agreement, Section 10.10, contains an integration clause whereby SCJ agreed that the written terms of the "[Purchase] Agreement . . . sets forth the entire understanding and agreement between the parties." *Id.*

SCJ attempts to pry itself lose from its contract by focusing on the fact that the Purchase Agreement also provided that SCJ could maintain an action for fraud. As we noted earlier, the district court relied upon the final sentence of Section 10.10 which provides that:"Nothing in this section 10.10 is intended to preclude any remedy for fraud or limit any right of Purchaser with respect to any breach of or inaccuracy in any

17

representation or warranty in this Agreement." R. at 248. SCJ argues that even if the non-reliance language is valid under Delaware law, its action for fraud survives under that sentence.

However, even if we were to conclude that the non-reliance provision of Section 10.10 can not be enforced as a matter of law under *Norton*, or that SCJ's fraud claim is prserved by the last sentence of Section 10.10, SCJ would still have to prove that disregarding its own suspicions about diversion and proceeding to closing without additional information was reasonable in order to prevail on its fraud claim.[9] SCJ knew, or certainly should have known, of the diversion that was occurring in the Latin American market. Its reliance on disclosures from Defendants was therefore clearly unreasonable given its contractual undertaking. To paraphrase the decision in *Great Lakes,* if we were to allow

> [SCJ] to disregard the clear terms of its disclaimers [by
> arguing its reliance on Defendants' disclosures was

---

[9] The reasonableness of SCJ's claimed reliance must be assessed in context with the non-reliance clause unless SCJ can establish fraud in the inducement. However, SCJ must also clear the "reasonableness hurdle" to prevail under that theory.

> "To establish fraud in the inducement, and thereby be relieved
> of the effect of the [Asset Purchase Agreement], [buyer is]
> required to establish the elements of common law deceit,
> which include 'misrepresentation of a material fact, made to
> induce action, and reasonable reliance on the false statement
> to the detriment of the person relying.

*Gloucester Holding Corp., v. U.S. Tape and Sticky Products, LLC* (Chancery, 2003) (internal quotation marks omitted.

reasonable] and to assert its claims of fraud, the carefully negotiated and crafted Purchase Agreement between the parties would . . . not be worth the paper it is written on. To allow [SCJ] to assert [that it acted reasonably given the Purchase Agreement] . . . would defeat the reasonable commercial expectations of the contracting parties and eviserate the utility of written contractual agreements.

*Id*. at 556.[10]  Accordingly, the district court erred in entering judgment for SCJ on its fraud claims against Defendants.

## B. Indemnification.

Defendants' final argument is that the district court incorrectly found that SCJ was entitled to indemnification under Section 9.03 of the Purchase Agreement for costs incurred defending against Tenneco's patent infringement suit.  Defendants argue that Section 9.03 merely explains the indemnification process, while the language in Section 9.01(a) of the Agreement provides for SCJ's actual right of indemnification.  *See* Appellants' Br. at 53.  As Defendants correctly explain, the district court held that Defendants' liability to indemnify SCJ for attorney's fees did not depend on the merits of that suit or its outcome.  Rather, "the court held that the word 'could' as used in Section 9.03(a) suggests both the *possibility* of recovery and the *possibility* of an indemnity

---

[10]  Moreover, given SCJ's willingness to go to closing without getting either answers to questions it asked about diversion, or written warranties that would have removed DowBrands' Latin American distribution from the umbrella of the disclaimer in Section 10.10, it is exceedingly difficult to conclude that that portion of DowBrands' business was actually material to SCJ's decision to purchase DowBrands' assets.

19

obligation under the Agreement." Appellants' Br. at 55 (emphasis in original). We agree with the district court's reading of the scope of Defendants' obligation to indemnify SCJ under the Purchase Agreement though our analysis differs somewhat. However, we disagree with the district court's conclusion that the amount of the indemnification is not reduced by the $10 million deductible contained in Section 9.04 ("Limitations on Indemnity Payments").

In Section 3.15, Defendants represented that they were transferring "all of the intellectual property rights necessary for or used in the conduct of the Business as currently conducted." Section 9.03 does establish the "process" for indemnification. It also states the procedure whereby Defendants will defend SCJ pursuant to the former's obligation to indemnify SCJ as long as the latter satisfies certain conditions such as prompt notice of the third party claim. Pursuant to Section 9.01 Defendants agreed to "pay and to indemnify fully, . . . and defend [SCJ] . . . against any and all claims . . . (including reasonable attorney's fees) . . . arising out of or relating to: (a) any . . . breach of any representation or warranty of [Defendants] contained in [the Purchase] Agreement." This required Defendants to indemnify SCJ for attorney's fees arising from the Tenneco litigation because it represented, in section 3.15, that it was transferring all necessary intellectual property rights and that it was the "sole and exclusive owner" of those rights. However, that obligation was subject to the deductible contained in Section 9.04.

20

Section 9.01 expressly subjects Defendants' obligation to indemnify to the $10 million deductible contained in Section 9.04. As noted above, Section 9.04 provides: "Other than with respect to Taxes, no claim for indemnification under Sections 9.01(a) or Section 5.01 may be made . . [or] required unless the aggregate amount of Damages . . . exceeds $10 million (and only for the amount of such excess)." The district court refused to apply that deductible because it concluded that "SCJ's claim for attorneys's fees . . . in the Tenneco Litigation does not arise under Section 9.01(a) or Section 5.01. Instead, [Defendants] breach of Section 9.03 of the Agreement gives SCJ a claim for indemnification under 9.01(b), for 'any breach of any covenant . . . of Sellers contained in this Agreement.'" We can not agree with the district court's reading of the Purchase Agreement.

The court's reliance on Section 9.03 essentially converts the procedural provision of Section 9.03 into a substantive provision equivalent to that found in Section 9.01. Section 9.03, however, simply sets forth the procedural process for SCJ's use when indemnification is warranted by Section 9.01; it does not provide an alternative basis for indemnification. By relying on Section 9.03, the district court incorrectly concluded that the "basket" provision of Section 9.04 did not apply to the Tenneco Litigation because Section 9.04 is not referenced in Section 9.03. The provision of 9.04, though, is explicitly incorporated into the substantive provision of Section 9.01 which provides that Defendants will indemnify SCJ for "damages" where SCJ is sued by a Third Party and the

21

suit arose "out of [or related to] any breach of any covenant or . . . representation" in the Purchase Agreement with SCJ. Because Tenneco's suit alleged that SCJ's use of the assets acquired from Defendants violated Tenneco's intellectual property rights, it constituted a potential breach of the warranties contained in Section 3.15 of the Agreement. Accordingly, Defendants' obligation to indemnify SCJ arose under Section 9.01 and was subject to the $10 million dollar deductible of Section 9.04 referenced therein. We therefore hold that the amount of "Damages" Defendants owe SCJ in the form of indemnified attorney's fees must be reduced by $10 million dollars. Therefore, Defendants would only owe the amount that exceeds that $10 million deductible. As we noted at the outset, SCJ's attorney's fees were less than that deductible. Accordingly, Defendants do not owe SCJ anything pursuant to their obligation to pay those fees.

## IV.

For all of the above reasons, we will reverse the district court's order dismissing SCJ's fraud claim, and refusing to apply the $10 million deductible. We will affirm the court's determination that Defendants must indemnify SCJ's attorney's fees incurred in defending against Tenneco's patent infringement claim.